# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| OWENS & MINOR, INC. and | § | |
| OWENS & MINOR FLEXIBLE | § | Case No. 3:24-cv-820 |
| BENEFITS PLAN | § | |
| | § | |
| V. | § | Second Amended Complaint |
| | § | |
| ANTHEM HEALTH PLANS OF | § | |
| VIRGINIA, INC. D/B/A ANTHEM | § | [Jury Trial Demanded] |
| BLUE CROSS AND BLUE SHIELD | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

    I.      Crux of the Case: A Fox in the Henhouse ....................................................... 1

    II.    Employers Sponsoring Healthcare Plans for Employees Almost Universally
         Hire Third Party Administrators Like Defendant ......................................... 5

    III.   In Recent Years, Plaintiff Grew More Sensitive to the Threat Posed by TPA
         Fraud, Waste, and Abuse ............................................................................. 7

    IV.   Defendant Actively Frustrated Plaintiff's Attempts to Access and Analyze
         the Plan's Claims Data .................................................................................. 8

PARTIES ................................................................................................................... 13

THE SIGNIFICANCE OF THE ADMINISTRATIVE SERVICES AGREEMENT
AND THE PARTIES' RESPECTIVE CONDUCT ........................................... 13

    I.      The Administrative Services Agreement Generally .................................... 13

    II.    The Parties Are ERISA Fiduciaries ........................................................... 14

         A.    By Virtue of Its Role as the Plan's TPA, Defendant
              Possessed and Exercised Control Over Plan Assets
              and Over Plan Administration and Management ........................... 16

         B.    Defendant's Discretion and Control Extended to
              Recovery of Monies Improperly Paid by the Plan or
              Otherwise Owed to the Plan ........................................................... 21

         C.    Plaintiff Owens & Minor is the Plan Sponsor and a Fiduciary With
              Standing to Prosecute ERISA Claims on the Plan's Behalf ........... 22

MULTIPLAN ............................................................................................................ 23

    II.    MultiPlan (and Other Out-of-Network Claim Processing Vendors) .............. 28

i

PRIMARY MISCONDUCT SERVING AS THE BASIS OF THIS LAWSUIT ............. 29

JURISDICTION AND VENUE ................................................................................ 52

CAUSE OF ACTION FOR ERISA VIOLATIONS ...................................................... 52

STATE LAW CAUSES OF ACTION ........................................................................ 58

    I.      Breach of Contract ................................................................................ 58

    II.     Breach of Implied Contractual Duty of Good Faith and Fair Dealing ........ 59

    III.    Breach of Fiduciary Duty ..................................................................... 62

    IV.    Fraudulent Failure to Disclose .............................................................. 67

    V.     Negligence ........................................................................................ 69

TOLLING OF LIMITATIONS PERIODS ................................................................. 71

JURY DEMAND ................................................................................................... 73

PRAYER FOR RELIEF ......................................................................................... 73

Plaintiff OWENS & MINOR, INC., individually and on behalf of Plaintiff OWENS & MINOR FLEXIBLE BENEFITS PLAN,[1] files this Second Amended Complaint against ANTHEM HEALTH PLANS OF VIRGINIA, INC. D/B/A ANTHEM BLUE CROSS AND BLUE SHIELD, and in support thereof states the following:

## INTRODUCTION[2]

### I.    CRUX OF THE CASE: A FOX IN THE HENHOUSE

1.    Like many employers across the country, Plaintiff Owens & Minor, Inc. sponsors a self-funded healthcare plan to provide quality healthcare to its employees and their families. Owens & Minor engaged Defendant to administer the millions of dollars it and its employees paid into the Plan. In September 2021, Plaintiff requested its Plan data from Defendant so that it could ensure that Defendant was faithfully administering the Plan's assets. Following this request, Defendant transformed what should have been a simple transfer of the *Plan's* data to the *Plan's* sponsor, into a nearly two-year game of "hide the ball."

2.    Defendant first claimed that it *could* not provide the requested data, and then said that it *would* not. After retaining outside counsel, Defendant said that it would provide the data only to later retract that promise. Eventually, Plaintiff had to sue Defendant to

---

[1] In this Complaint, "Plaintiff" refers collectively to Owens & Minor, Inc. in its individual capacity and in its capacity as fiduciary representative of the Owens & Minor Flexible Benefits Plan unless otherwise provided expressly or by context. "Owens & Minor" refers specifically to Owens & Minor, Inc. "Plan" refers specifically to Owens & Minor Flexible Benefits Plan.

[2] Plaintiff files this Second Amended Complaint to address certain arguments in Defendant's memorandum in support of its motion to dismiss, ECF 14. While Plaintiff disagrees that Defendant's arguments support dismissal of any cause of action, Plaintiff intends to further clarify and allege facts in support of its claims.

obtain its own data.[3] Now that Plaintiff has a portion of that Plan data and has had some opportunity to analyze it, it is clear why Defendant fought so hard to prevent Plaintiff from accessing it. Plaintiff's analysis to date has revealed tens of millions of dollars of damages to Plaintiff as a result of Defendant's neglect and misconduct. Plaintiff suspects the damages will grow significantly upon receipt of the remaining data which continues to be withheld.

3.      As is well known, healthcare in America is facing a severe crisis. Skyrocketing costs have made it increasingly difficult for hard-working Americans to afford essential medical care or prescription drugs.[4] Health plan administrators—like Defendant—are at the root of the problem.

4.      Employers across the country, like Plaintiff, have hired and trusted third-party administrators to manage and safeguard the assets of their self-funded health insurance plans with the utmost care. Although these administrators are fiduciaries to the plans and the plans' beneficiaries, nationwide reports have revealed widespread misconduct. Specifically, investigations have uncovered that administrators' acts and omissions have resulted in the misappropriation and waste of billions of plan dollars. Hard-working Americans bear the cost of such misconduct in the form of ever-increasing healthcare costs and premiums.

---

[3] *Owens & Minor, Inc., et al. v. Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield*, Case No. 3:23-cv-00115-REP, E.D. Va.

[4] Aimee Picchi, *Americans spend more on health care than any other nation. Yet almost half can't afford care.*, CBS NEWS (July 17, 2024), *available at* https://www.cbsnews.com/news/health-care-almost-half-of-americans-struggle-to-afford-medical-care/ (last accessed Nov. 15, 2024).

5.      Defendant served as a fiduciary under the Employee Retirement Income Security Act (**ERISA**) with respect to funds it held, controlled, and used to pay healthcare costs for participants and beneficiaries in Plaintiff's self-funded healthcare plan. "ERISA guarantees plan beneficiaries a fiduciary who acts solely in their interests"; thus, "a fiduciary laboring under a conflict of interest must act as if [it] is free of such a conflict." *Edmonds v. Hughes Aircraft Co.*, 145 F.3d 1324, 1998 WL 228200, at *8 (4th Cir. 1998) (some quote omitted). "Free" in the ERISA sense is "an absolute." *Id.* ERISA therefore leaves no room for "balancing" of a fiduciary's interests against those of plan participants and beneficiaries. *Id.* "ERISA commands undivided loyalty" by Defendant. "If faithfully discharging such a duty appears especially arduous, that is because it is." *Id.* ERISA duties of care and integrity remain the highest known. *Id.*

6.      Relying on Defendant's assurances that it would faithfully serve as an ERISA fiduciary, Plaintiff trusted Defendant—a purportedly reputable company with a household name—with millions of dollars intended to fund healthcare for employees of Owens & Minor and their families enrolled in the Plan. Defendant sought out and readily accepted the responsibility of a fiduciary with respect to those funds because Defendant stood to earn significant sums in fair, transparent payment for its services. Unbeknownst to Plaintiff, Defendant wanted more than fair payment. And unbeknownst to Plaintiff, Defendant had no interest in protecting the Plan as a fiduciary must under the law.

7.      Defendant willingly undertook the duty to discharge its responsibilities solely in the interests of those employees and their families.

3

8.    Defendant willingly agreed to discharge its duties for the exclusive purpose of providing benefits to those employees and their families.

9.    Defendant willingly undertook the duty to defray expenses incurred by the Plan.

10.    Defendant willingly undertook the duty to exercise the care, skill, prudence, and diligence of a reasonable fiduciary and TPA.

11.    However, Defendant's boundless avarice and neglect caused it to violate these duties on all fronts. Reports of widespread TPA misconduct caused Plaintiff concern. Following President Reagan's oft-stated mantra, "trust but verify," Plaintiff sought to verify that Defendant executed its duties according to ERISA's unbending standards and that Plaintiff itself was not a victim of misconduct. When Plaintiff began its investigation, it quickly realized that Defendant's disclosures relating to the Plan were not sufficient to ascertain whether Defendant's performance satisfied its relevant duties. Part of the information needed was the Plan's claims data. But Defendant refused to disclose the Plan's claims data, which was essential to confirm Defendant had not wasted funds, defrauded Plaintiff, or abused Plaintiff's trust. Defendant even forced Plaintiff to sue Defendant to obtain this information—information that Defendant claimed Plaintiff had no right to view.

12.    But Plaintiff has a portion of that data now. That data reveals Defendant used Plan assets for its own purposes and is not worthy of even minimal levels of trust. Specifically, it demonstrates how Defendant used Plan funds to enrich itself and its affiliated companies and medical providers to the Plan's detriment. The data further

4

demonstrates that Defendant sought to increase the costs of Plan administration—or simply made no effort to control Plan costs—because doing so increased Defendant's profits. Defendant acted contrary to the fiduciary standards imposed by ERISA by, among other things, (i) paying more for healthcare claims than was even billed, (ii) securing kickbacks from providers and affiliated intermediaries, (iii) double-paying claims, and (iv) pocketing rebates belonging to Plaintiff.

13.    As a result, the Plan has incurred significant losses paid for by employees of Owens & Minor and the company itself. Importantly, Defendant has continued to withhold other information from Plaintiff that would enable it to calculate the full extent of losses it has suffered as a result of Defendant's misconduct. Plaintiff anticipates that, upon reviewing that information in discovery, Defendant's misconduct and Plaintiff's losses will become fully exposed. Plaintiff files this suit to recover its losses and claw back Defendant's ill-gotten gains.

## II.    EMPLOYERS SPONSORING HEALTHCARE PLANS FOR EMPLOYEES ALMOST UNIVERSALLY HIRE THIRD PARTY ADMINISTRATORS LIKE DEFENDANT.

14.    Throughout the country, employers large and small provide healthcare benefits for their employees. Many employers, including Owens & Minor, provide health benefits through self-funded plans, whereby the plan funds employees' and their beneficiaries' healthcare expenses primarily from employer and employee contributions.

15.    As sponsors and plan administrators of self-funded plans, employers owe fiduciary duties under ERISA to the plans and to the employees and beneficiaries covered by those plans. ERISA allows plan sponsors to delegate those fiduciary responsibilities to

5

third parties who possess the expertise, infrastructure, and systems to manage certain aspects of those plans. Thus, to manage the plan's claims administration, employers generally hire third party administrators based on their advertised ability to manage the plan.

16.    For these reasons, there is a significant and lucrative market for third party administrators (**TPAs**). TPAs specialize in the healthcare benefits business. They possess the expertise, personnel, and systems to price, administer, and process healthcare claims. TPAs like Defendant market themselves as possessing the expertise and integrity necessary to serve as fiduciary plan administrators. Thus, employers sponsoring self-funded healthcare plans generally entrust their plans' assets and the health of their employees to TPAs.

17.    In 2017, Owens & Minor hired Defendant Anthem, a TPA who purports to specialize in the administration of self-funded plans and to manage healthcare claims for plans with the level of care and loyalty demanded by ERISA. In doing so, Plaintiff entrusted Plan assets and the care of its employees to Defendant. Nevertheless, as Plan sponsor, administrator, and named fiduciary, Owens & Minor retained duties under ERISA to monitor Defendant, protect Plan assets, and oversee the quality of care provided to its employees and beneficiaries. Owens & Minor reasonably expected Defendant to comply with the law and carry out its duties solely in the interest of the Plan's participants and beneficiaries and for the sole purpose of providing healthcare benefits to them while defraying the expenses of the Plan. Defendant, however, did just the opposite, because violating the law generates more profits for Defendant and its affiliates.

### III.    IN RECENT YEARS, PLAINTIFF GREW MORE SENSITIVE TO THE THREAT POSED BY TPA FRAUD, WASTE, AND ABUSE.

18.    The past few years have generated reports of wrongdoing that justify Plaintiff's efforts to investigate Defendant's management of the Plan. These reports detail several instances where opportunistic claims administrators employed illegal or unethical means to obtain windfall profits at the expense of self-funded plans and taxpayers alike. As an example, one report claimed certain claims administrators illegally incentivized healthcare providers to report that Medicare Advantage patients are sicker than they actually are, because the insurers received more income for patients with more serious documented conditions. According to a *New York Times* report, the misconduct caused between $12 billion and $25 billion in overpayments by Medicare in 2020 alone.[5]

19.    Other developments further justify Plaintiff's efforts to carefully assess Defendant's claims administration practices.[6] One report revealed that merely replacing a claims administrator saved a governmental entity such a large sum of money that there simply had to be waste or other problems in the claims administration processes.[7] The news

---

[5] Reed Abelson and Margot Sanger-Katz, *'The Cash Monster Was Insatiable': How Insurers Exploited Medicare for Billions*, N.Y. TIMES (Oct. 8, 2022) *available at* https://www.nytimes.com/2022/10/08/upshot/medicare-advantage-fraud-allegations.html, last visited Oct. 10, 2022.

[6] *See, e.g.*, *Employer Held Liable for Service Provider's Error*, J.D. SUPRA (Dec. 31, 2020) *available at* https://web.archive.org/web/20201231211429/https://www.jdsupra.com/legalnews/employer-held-liable-for-service-89209/#expand/, last visited Nov. 17, 2024.

[7] *TRS says it will save millions on new health administrators, assures members of minimal plan impacts*, TEXAS AFT (Feb. 27, 2020), *available at* https://web.archive.org/web/20221004070344/https://www.texasaft.org/government/trs/trs-says-it-will-save-millions-on-new-health-administrators-assures-members-of-minimal-plan-impacts/,

was saturated with stories regarding the harm that TPAs can cause.[8] In fact, the American Medical Association estimates that commercial health insurers have an average claims-processing error rate of 19.3 percent, which creates excess costs of $17 billion annually.[9] Another report, which comes from the nonpartisan Council on Health Care Spending and Value, opined that excess administrative costs wasted between $285 billion and $570 billion in healthcare spending in 2019 alone.[10]

20.    The information reported in those articles and similar reports demonstrates that Plaintiff's sensitivity to the risks potentially posed by its Plan's TPA was well-founded. These reports support Plaintiff's heightened efforts since 2021 to assess Defendant's performance and to ensure Defendant honored its fiduciary duties to the Plan, participants, and beneficiaries.

## IV.    DEFENDANT ACTIVELY FRUSTRATED PLAINTIFF'S ATTEMPTS TO ACCESS AND ANALYZE THE PLAN'S CLAIMS DATA.

21.    In September 2021, Plaintiff requested its Plan's claims data and information from Defendant in order to assess the Plan's performance financially and with

---

last visited Nov. 17, 2022 (Texas teacher retirement system saved hundreds of millions of dollars by replacing claims administrator).

[8] *See*, *e.g.*, Brendan Pierson, *Mass. Blue Cross sued for 'mismanagement' of state employee health plan*, REUTERS (Mar. 29, 2021), *available at* https://www.reuters.com/article/health-blue-cross/mass-blue-cross-sued-for-mismanagement-of-state-employee-health-plan-idUSL1N2LR2IC, last visited Nov. 17, 2024 (discussing litigation involving allegations of self-dealing).

[9] *AMA blasts insurers on 19.3 percent claims error rate*, HEALTHCARE IT NEWS (June 20, 2011), *available at* https://www.healthcareitnews.com/news/ama-blasts-insurers-193-percent-claims-error-rate, last visited Nov. 17, 2024.

[10] *The Role Of Administrative Waste In Excess US Health Spending*, HEALTH AFFAIRS (Oct. 6, 2022), *available at* https://www.healthaffairs.org/content/briefs/administrative-waste-excess-health-spending, last visited Nov. 17, 2024.

respect to the adequacy of care that Plaintiff's employees and their beneficiaries received. What should have been a simple transfer of *the Plan's* information from Defendant to Owens & Minor—the Plan sponsor, named fiduciary, and administrator—turned into a year-long trail of emails and other correspondence, littered with Defendant's excuses, arbitrary conditions, and illusory promises. For example, Defendant would agree to provide the information and then renege, citing some obscure, inapplicable condition in its form agreement, which Defendant had carefully crafted in an effort to illegally sidestep its fiduciary duties. Of course, to any extent Defendant's crafty contract provisions purport to relieve Defendant of its fiduciary responsibilities, ERISA invalidates those provisions.

22.    Determined to obtain the Plan's information, Plaintiff patiently endured Defendant's parade of promises, delays, obfuscation, and excuses. Plaintiff even attempted to satisfy some of Defendant's arbitrary and baseless conditions. Despite Plaintiff's year-long efforts to obtain claims data belonging to the Plan it sponsors and oversees, Defendant continued to block Plaintiff from even the most basic information it needed to assess the Plan's performance.

23.    For example, Plaintiff repeatedly requested that Defendant provide the most comprehensive data in Defendant's possession regarding each claim paid by the Plan, including the "Billed Amount," "Excluded Amount," and "Allowed Amount" for each claim. This basic Plan information was crucial for Plaintiff to understand whether Defendant was causing Plan funds to be spent improperly, such as causing the Plan to pay more than billed charges for medical claims. After months of requesting this information,

9

Defendant eventually told Plaintiff that it "won't release" this basic data because it might reveal their "confidential" arrangements with providers:

From: Turner, Hannah <hannah.turner@anthem.com>
Sent: Monday, February 21, 2022 4:58 PM
To: Boykin, Timothy <Timothy.Boykin@owens-minor.com>
Cc: Jones, Chloe <Chloe.Jones@owens-minor.com>; Taylor, Charles J. <charles.taylor@anthem.com>
Subject: [EXTERNAL] RE: OMI Anthem Data Request - Medical

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you question any part of this email, please forward to Phishing@Owens-Minor.com

Hi Tim and a late Happy New Year! – Thanks for your outreach. I'm happy to have our data team leaders review this request. Out of the gate, I will say that we won't release both allowed and paid/billed. This would expose our confidential discounts/payment contracts aligned to each provider. Are you comfortable removing one of those before I submit to our team for review? If yes, which would you be willing to remove?

Thanks,
Hannah
Anthem, Inc.
Hannah R. Turner, *Client Executive, National Accounts*

(emphasis added).

24.    After Plaintiff pushed back against Defendant's refusal to provide Plaintiff with its *own* Plan data, and only after Plaintiff and engaged outside counsel to take steps to obtain the data through the judicial process if necessary, Defendant pretended to relent. In August 2022—nearly a year after Plaintiff first started trying to obtain the Plan data— Defendant wrote that it would provide the requested data fields after all, subject to the execution of a confidentiality agreement:

10

Further, we will continue to exclude DME claims for services outside of Owens & Minor, but agree to include the following data elements in the data set for the sole and permitted purpose to be stated on the DRSF:

1. Allowed Charges
2. Billed Charges
3. Excluded Charges
4. BlueCard data – related to claims detail requested in non-Anthem states

I look forward to your confirmation on intended recipient of the requested data.

My Best,
Hannah
**Hannah R. Turner**
Client Executive, Anthem National Accounts

25.     *However*, when Defendant sent the draft confidentiality agreement and final data field list to Plaintiff for execution, it became clear that Defendant was reneging on its promise to provide all of the requested claim information. Once again, the "Billed Amount" and "Allowed Amount" data fields were removed from the list of items that Defendant said it would produce. The confidentiality agreement also included a broadly worded "Disclaimer and Exculpation" provision that purported to disclaim the accuracy of the claims information Defendant would provide, and even *release* Defendant from *all liability* related to any "erroneous, inaccurate, or incomplete information." Plaintiff rejected Defendant's attempt to walk back its commitment to provide these data fields and to shield itself from liability.

26.     Defendant's actions hindered Plaintiff's ability to carry out its own fiduciary duties to the Plan, Plan participants, and beneficiaries as they relate to monitoring and assessing Defendant's claims management practices and performance of its fiduciary duties. In other words, only Defendant itself had the capability to determine whether it was meeting ERISA's standards.

27.     Plaintiff sued Defendant in 2023 to obtain access to its Plan's claims data. Now, Plaintiff has a portion of that data and has had some opportunity to analyze that data. That analysis revealed Defendant violated its ERISA duties in numerous—and costly—respects. Plaintiff now seeks recovery of losses caused by Defendant's violations.

28.     Even now, Defendant continues to withhold Plan information that is necessary for Plaintiff to assess the full scope and impact of Defendant's wrongdoing.[11] This information includes, but is not limited to the following:

(i)      Defendant's payment processing rules and claim payment methodologies applicable to the Plan, which will allow Plaintiff to determine the accuracy of certain payments Defendant caused the Plan to make;

(ii)     Defendant's agreements with providers, Pharmacy Benefit Managers and other third-parties (such as affiliated pharmacies and providers, insurance networks, and vendors) applicable to the Plan, which will enable Plaintiff to determine the accuracy of certain payments and the full extent of Defendant's self-dealing and misappropriation of Plan assets; and

(iii)    information regarding the amount of Plan funds that were actually paid to pharmacies on Plan members' pharmaceutical claims, so that the Plan

---

[11] Other plan sponsors have faced similar stonewalling. For example, Anthem was hired by the state of Indiana to administer certain state Medicaid programs. During a recent audit of pharmaceutical claims for those programs, Anthem failed—even in the face of a Civil Investigative Demand issued by the Indiana Attorney General—to provide the information necessary for Indiana to complete its audit. *See* https://iga.in.gov/publications/agency_report/State%20PBM%20Contracts.pdf, at 20, last visited Feb. 6, 2025.

can calculate how much more Defendant caused the Plan to pay out for those drugs as compared to the amount that the pharmacies actually charged.

## PARTIES

29.    Plaintiff Owens & Minor, Inc. is a Virginia corporation headquartered in Mechanicsville, Virginia. Plaintiff employs thousands of people across the United States. Plaintiff is the sponsor and named fiduciary for Plaintiff Owens & Minor Flexible Benefits Plan (**Plan**). The Plan is a welfare benefit plan under ERISA that provides healthcare coverage for Plaintiff's employees and their beneficiaries. The Plan is "self-funded," meaning that the Plan is primarily funded by contributions from Plaintiff Owens & Minor and Plan participants— *i.e.*, Owens & Minor's employees.

30.    Defendant Anthem Health Plans of Virginia, Inc. dba Anthem Blue Cross and Blue Shield is a Virginia corporation.

## THE SIGNIFICANCE OF THE ADMINISTRATIVE SERVICES AGREEMENT AND THE PARTIES' RESPECTIVE CONDUCT

### I.    THE ADMINISTRATIVE SERVICES AGREEMENT GENERALLY

31.    The parties' Administrative Services Agreement (**ASA**) conclusively establishes that Defendant is a fiduciary under ERISA.

32.    Plaintiff required the services of a TPA to administer the Plan. Plaintiff is not a claims administrator and does not possess the expertise, personnel, or systems necessary to administer the Plan's claims. Based on Defendant's various representations detailed below, Plaintiff engaged Defendant as the Plan's TPA and executed the ASA, delegating

13

much of Plaintiff's fiduciary responsibilities under the Plan to Defendant. Defendant knew Plaintiff lacked the ability to serve as the Plan's claims administrator, and Defendant knew that Plaintiff relied on Defendant's assurances regarding its services and integrity. Thus, Defendant and Plaintiff agreed—through the ASA—that Defendant would serve the Plan as its fiduciary TPA.

33.    The ASA became effective on June 1, 2017, **Ex. A** at 1,[12] and Plaintiff began suffering losses immediately.[13]

34.    In the ASA, the parties acknowledged that Plaintiff "is the sponsor of a self-funded Group Health Plan . . . providing . . . health care benefits to certain eligible employees and their qualified dependents." **Ex. A** at 1. The parties agreed that Defendant would "administer certain elements of [Plaintiff's] Group Health Plan." *Id.* The ASA also identified the Plan as an ERISA plan. *Id.*

35.    Plaintiff has complied with all aspects of the ASA and other agreements that comprise the ASA and govern the relationships among the Plan, Owens & Minor, and Defendant.

## II.    THE PARTIES ARE ERISA FIDUCIARIES.

36.    Defendant and Owens & Minor are both Plan fiduciaries. Owens & Minor is a named fiduciary and the Plan's sponsor and administrator. Defendant is a functional

---

[12] While this ASA has been renewed and amended through the years, the relevant portions, except for certain performance guarantees and other more minor provisions, have remained static. Relevant portions of the ASA have been highlighted for ease of reference.

[13] The parties executed a tolling agreement that permits Plaintiff to recover all damages caused back to the effective date notwithstanding the statutory limitations period under ERISA and other applicable law.

fiduciary and has expressly assumed fiduciary duties to the Plan at issue here.

37. ERISA fiduciaries are either "named" or "functional." A named fiduciary "means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly." 29 U.S.C. § 1102(a)(2). There are three general categories of functional fiduciaries defined by ERISA:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan *or* exercises any authority or control respecting management or disposition of its assets,

(ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, *or* has any authority or responsibility to do so, *or*

(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated [as fiduciary] under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A) (emphasis added). Defendant is a "fiduciary" under one or more of these definitions.

15

**A. BY VIRTUE OF ITS ROLE AS THE PLAN'S TPA, DEFENDANT POSSESSED AND EXERCISED CONTROL OVER PLAN ASSETS AND OVER PLAN ADMINISTRATION AND MANAGEMENT.**

38.    As noted above, the Plan is self-funded. Thus, Plan assets represent contributions by Owens & Minor, its employees, and its former employees. Those contributions benefit the Plan, Plan participants, and beneficiaries by paying healthcare claims for participants and beneficiaries. Plaintiff represents to participants and beneficiaries that Owens & Minor's and the participants' contributions secure the healthcare benefits promised to them by Plaintiff. The amount of contributions is based in large part on Plan costs and expenditures each year. This is a common-sense proposition given that the Plan directly pays for healthcare claims, which Defendant administered for the Plan. Defendant assumed a fiduciary role by accepting and exercising authority, control, and discretion over plan management and assets.

39.    The ASA expressly names Defendant as a Plan fiduciary with respect to key functions of the Plan and identifies Defendant as a functional fiduciary with respect to other actions:

Pursuant to Section 405(c)(1) of ERISA, *[Plaintiff] delegates to [Defendant] fiduciary authority to determine claims for benefits under the Plan* as well as the authority to act as the appropriate fiduciary under Section 503 of ERISA to determine appeals of any adverse benefit determinations under the Plan. [Defendant] shall administer complaints, appeals and requests for independent review according to [Defendant's] complaint and appeals policy, and any applicable law or regulation, unless otherwise provided in

16

the Benefits Booklet. In carrying out this authority, *[Defendant] is delegated full discretion to determine eligibility for benefits under the Plan and to interpret the terms of the Plan*. [Defendant] shall be deemed to have properly exercised such authority unless a Member proves that [Defendant] has abused its discretion or that its decision is arbitrary and capricious. *[Defendant] is a fiduciary of the Plan only to the extent necessary to perform its obligations and duties as expressed in this Agreement* and only to the extent that its performance of such actions constitutes fiduciary action under ERISA.

**Ex. A** at 4, art. 2.c (emphasis added). Consistent with the broad scope of this provision, Defendant possessed and exercised full, unilateral, unfettered discretion and control with respect to (i) determining how much the Plan would pay for each prescription and medical claim; (ii) determining whether each claim fell within the scope of benefits covered by the Plan; (iii) determining the number of units of prescriptions and medical services for which the Plan would pay with respect to individual claims and treatment plans of each participant and beneficiary; (iv) determining whether and how to review obvious and reasonably identifiable overpayments by the Plan, duplicate claims, claims for uncovered services, claims lacking evidence of proper certification, claims based on coding errors, and claims for services not actually rendered; (iv) determining whether the services underlying the claims were properly coded under generally acceptable coding guidelines such that the claim should be paid with Plan assets; and (v) determining the amount of Plan money Defendant would use to pay claims.

17

40.     The ASA assigned Defendant the duty and right to process claims and "to determine the amount" that "is due and payable" according to *Defendant's* "medical policies and medical policy exception process, its definition of medical necessity, [and] its precertification and/or preauthorization policies." **Ex. A** at 3, art. 2.b (emphasis added). Thus, Defendant possessed authority—which it exercised during all relevant times—to unilaterally commit Plan funds to pay healthcare claims.[14]

41.     Defendant enjoyed discretion with respect to "[t]he amount charged" against the Plan. **Ex. A** at 2 ("PAID CLAIM"). For instance, the ASA purports to grant Defendant discretion to pay a vendor more than actual billed charges for a particular service or supply. *Id.* § 1. It permitted Defendant to decide the reimbursement methodology for claims without express regard to cost. *Id.* And it required the Plan to pay Defendant for claims "without regard . . . to whether such payments are increased or decreased by the . . . achievement of, or failure to achieve, certain specified goals, outcomes or standards *adopted by [Defendant]*." *Id.* (emphasis added).

42.     Defendant exercised extensive control, authority, and discretion over the Plan and its assets through Defendant's contractual arrangements with providers. Both in practice and under the ASA, Defendant exercised absolute control over reimbursement arrangements with providers, which directly impacted both the amounts paid by the Plan and the quality of healthcare provided under the Plan. *See, e.g.*, **Ex. A** at 5, art. 2.s.

---

[14] Defendant's actions to withhold Plan information from Plaintiff and claim that Plaintiff is not entitled to such information, as discussed herein, emphasize Defendant's authority over the Plan and its assets.

("[Defendant] shall have the authority, in its sole discretion, to build and maintain its Provider network on its own behalf. . . . [Defendant] shall be solely responsible for . . . negotiating rates with Providers or auditing Providers. . . ."), art. 2.o (Defendant's contracts with providers, as Defendant may amend them from time to time, will be used to administer and price claims). This control extends to pharmaceutical benefits paid with Plan assets. *See, e.g.*, **Ex. A** at 12, art. 14.a.1 ("[Defendant] shall determine, in its sole discretion, which pharmacies shall be Network Pharmacies, and the composition of Network Pharmacies may change from time to time."); art. 14.a.2 (Plan "shall" adopt the formulary that governs, among other things, the amount the Plan pays for prescription drugs).

43.    Defendant also enjoyed control and discretion over sums it retained from the difference of amounts paid by the Plan for prescription drugs and the amount actually invoiced for prescription drugs. **Ex. A** at 2, § 2.

44.    Defendant enjoyed discretion and control with respect to settling claims and other disputes that would then be charged against the Plan. **Ex. A** at 2, § 5.

45.    Defendant's control over Plan assets is extensive. Defendant, based on its control and discretion described above, unilaterally determines the amounts to be paid by the Plan for healthcare claims. *See, e.g.*, **Ex. A** at 2-3 ("PAID CLAIM"). Under the ASA, Defendant is authorized to take control of Plan monies and apply them to amounts Defendant determines are due. Under the ASA, the Plan must pay those sums, which are not subject to dispute by Plaintiff, on a weekly basis, and the ASA authorizes Defendant to take that money from the Plan through an automated clearing house (**ACH**) "pull": "Anthem will initiate an ACH demand debit transaction that will withdraw the amount due

19

from a designated Employer bank account no later than three (3) business days following the Invoice Due Date." **Ex. A** at 21-22, schedule A § 4.

46.     Other documents mirror these ASA provisions:

[Defendant] shall have all the powers necessary or appropriate to enable it to carry out its duties in connection with the operation of the Plan and interpretation of the Benefit Booklet. This includes, without limitation, the power to construe the Administrative Services Agreement, *to determine all questions arising under the Plan*, to resolve Member appeals and to make, establish and amend the rules, regulations and procedures with regard to the interpretation of the Benefit Booklet of the Plan. A specific limitation or exclusion will override more general benefit language. [Defendant] has complete discretion to interpret the Benefit Booklet. *The Claims Administrator's[15] determination shall be final and conclusive and may include, without limitation, determination of whether the services, treatment, or supplies are Medically Necessary, Experimental/Investigative, whether surgery is cosmetic, and whether charges are consistent with the Plan's Maximum Allowed Amount*." **Ex. B**, 2020 SPD at 84. (emphasis and footnote added).[16]

---

[15] "Claims administrator" refers to Defendant Anthem. **Ex. B**, 2020 SPD at 93.

[16] "SPD" refers to Summary Plan Description or the Medical Benefit Booklet attached as exhibit B. Relevant portions of the SPD have been highlighted for ease of reference.

20

47.     The SPD describes the "maximum amount of reimbursement *[Defendant]* will allow for services and supplies" and refers to Defendant's determination of the maximum allowed reimbursement for particular services. **Ex. B**, 2020 SPD at 62-63 (emphasis added).

48.     With respect to out-of-network claims, Defendant acknowledged that it established, "at its[] discretion," the fee schedule/rate for those services. **Ex. B**, 2020 SPD at 63.

49.     The Plan documents make clear that all monies committed by Defendant to fund claims belong to the Plan. For instance, Defendant has repeatedly disclaimed any obligation for payment of claims and concedes that monies Defendant applies to pay claims belong to the Plan. *See* **Ex. B**, 2020 SPD at 2, 93. Indeed, Defendant represents that it "does not assume any financial risk or obligation with respect to claims." **Ex. B**, 2020 SPD at 93. The Plan assumed all financial risk while Defendant retained control and discretion to administer the Plan and allocate its assets.

### B. DEFENDANT'S DISCRETION AND CONTROL EXTENDED TO RECOVERY OF MONIES IMPROPERLY PAID BY THE PLAN OR OTHERWISE OWED TO THE PLAN.

50.     Defendant's control, authority, and discretion over Plan management, administration, and assets extended beyond the value it allowed and paid on claims in the first instance. With respect to Defendant's authority to pursue recovery of sums caused by its overpayment of claims, Defendant "shall determine which recoveries it will pursue, and in no event will [Defendant] pursue a recovery if it reasonably believes that the cost of the collection is likely to exceed the recovery amount or if the recovery is prohibited by law or

an agreement with a Provider or Vendor." **Ex. A** at 11, art. 13.e. With respect to overpayment discovered in Plan-initiated audits, "[a]ny errors identified as the result of the audit shall be subject to [Defendant's] review and acceptance prior to initiating any recoveries of Paid Claims." **Ex. A** at 10, art. 12.d.[17]

51.    Defendant's extensive control and discretion with respect to audits likewise evidences unlimited control and authority over Plan assets vis-à-vis payment of claims. As alleged above, even if an audit shows that claims were improperly paid, the Plan can make no recovery of its assets without "[Defendant's] review and acceptance" of the audit results. **Ex. A** at 10, art. 12.d. The ASA purports to grant Defendant extensive control over the audit process, including selection of the auditor and parameters of the audit. *See generally* **Ex. A** art. 12. To the extent Defendant recovers Plan monies through its own audit, it exercises extensive control over whether and how to even pursue recoveries and over the amount of those recovered monies that return to the Plan. *See* **Ex. A** arts. 13.d-e.

52.    Further, "[Defendant] may, but is not required to, readjudicate Claims or adjust [Plan participants' and beneficiaries'] cost share payments related to the recoveries made from a Provider or a Vendor." **Ex. A** at 11, art. 13.e.

C. **PLAINTIFF OWENS & MINOR IS THE PLAN SPONSOR AND A FIDUCIARY WITH STANDING TO PROSECUTE ERISA CLAIMS ON THE PLAN'S BEHALF.**

53.    The ASA identifies Plaintiff as the Plan sponsor, named fiduciary, and as the party with primary discretion and authority over all aspects of the Plan. **Ex. A** at 1 and 7,

---

[17] Similarly, "settlements of reimbursement disputes brought by Providers do not require the approval of [Plaintiff]." **Ex. A** at 13, art. 16.e.

art. 3.b. (acknowledging that "[Plaintiff] retains all final authority and responsibility for the Plan," which would necessarily include efforts to recover Plan losses caused by Defendant).

54.    Indeed, as the sponsor and named fiduciary of the Plan, Plaintiff is afforded discretion and control over Plan assets and management of the Plan. Plaintiff's fiduciary role extends to exercising discretion over and management of TPAs such as Defendant. Relevant here is Plaintiff's authority under the Plan—and its duty to the Plan and Plan beneficiaries and participants—to engage and monitor TPAs and seek recovery of any losses that TPAs cause to the Plan.

55.    Plaintiff's review of its Plan's claims data reveals Defendant violated its duty to manage the Plan with the requisite prudence and "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." *See* 29 U.S.C. §§ 1104(a)(1), 1105(a) and (c). Recovering losses incurred by the Plan caused by Defendant's violations lies at the heart of Plaintiff's authority and duty as the Plan sponsor, administrator, and named fiduciary.

## **MULTIPLAN**

23

25

## II.    MULTIPLAN (AND OTHER OUT-OF-NETWORK CLAIM PROCESSING VENDORS)

66.    When a Plan member goes out-of-network for healthcare services, Defendant engages a third-party vendor, generally MultiPlan, to negotiate discounts and a payment amount with the providers. For simply engaging a vendor to negotiate with these out-of-network providers, Defendant charges Plaintiff unreasonable fees, which can reach

28

50% of the difference between the amount billed and the amount determined to be Plaintiff's responsibility (either the negotiated amount or, if negotiations are not successful, an amount determined by a pricing tool approved by Defendant). A fiduciary in Defendant's position must act in the principal's best interests—not its own. But rather than mitigate these costs to the Plan, Defendant uses outside vendors, such as MultiPlan, as a mechanism to divert Plaintiff's money to itself.

67.    Defendant's conduct results in Defendant pocketing a windfall of exorbitant, unjustified fees at Plaintiff's expense. Rather than fulfill its fiduciary and other relevant duties to Plaintiff, Defendant enters into "confidential" contractual arrangements with vendors such as Multiplan so that Defendant can take money from Plaintiff while maintaining opacity.

### PRIMARY MISCONDUCT SERVING AS THE BASIS OF THIS LAWSUIT

68.    Importantly, Defendant *expressly* agreed to serve as a fiduciary with respect to (i) "determin[ing] claims for benefits under the Plan"; (ii) "determin[ing] eligibility for benefits under the Plan"; (iii) "interpret[ing] the terms of the Plan"; and (iv) "perform[ing] its obligations and duties as expressed in [the ASA] . . . to the extent that its performance of such actions constitutes fiduciary action under ERISA." **Ex. A** at 4, art. 2.c. Defendant's misconduct falls within the broad scope of Defendant's express agreement to serve as a fiduciary. And given Defendant's possession and exercise of unfettered discretion and control over other relevant matters, Defendant was a functional fiduciary under ERISA with respect to carrying out the relevant misconduct alleged below. *Supra* ¶¶ 39 *et seq.* While the misconduct alleged in the following paragraphs and summarized in bold font

falls within the scope of this discretion and control—and therefore supports claims under ERISA—the misconduct alleged below also supports state-law claims alleged below.

69. **Causing Plaintiff to grossly overpay claims, including payments to certain providers exceeding 100% of charges actually billed by those providers**: As provided above, Defendant exercised full discretion with respect to (i) "determin[ing] claims for benefits under the Plan"; (ii) interpreting the terms of the Plan; (iii) determining how much Plaintiff would pay for claims; (iv) committing Plaintiff's money to pay claims; and (v) identifying and recovering overpayments, including deciding whether and how to identify and recover overpayments. *Supra* ¶¶ 39, 41, 43, 45, 47, 50-52. Defendant's unilateral decision to commit Plaintiff's money to pay more than 100% of billed amounts to certain providers therefore falls within the scope of Defendant's fiduciary role. While the number of claims to which this allegation applies renders it impracticable to identify each claim here, Plaintiff provides examples in **Ex. D**, attached hereto and filed under seal.

70. There is simply no good-faith basis for paying more on claims than a provider even sought to recover on a given claim. If a trustee sought to repair a plumbing defect in the trust beneficiary's home and paid the plumber $1,000 *more* than the plumber's invoice, there would simply be no reasonable excuse for this waste and abuse of trust assets. Likewise, Defendant cannot reasonably justify paying more than a provider even charged using Plaintiff's money. Defendant has no reasonable excuse for this practice. Certainly, Plaintiff obtained no benefit from this practice. To the contrary, Defendant overpaid certain providers on claims because (i) those providers had agreed to pay kickbacks to Defendant or to its affiliates, (ii) such overpayments increased the profit margin for Defendant and its

30

affiliates, and (iii) such providers agreed to take less in payments for services rendered under Defendant's and its affiliates' fully insured plans. Alternatively, these failures are the result of Defendant's failure to reasonably monitor claims for overpayment of such claims. These failures stemmed from neglect and lack of care driven by Defendant's desire to avoid spending money to monitor those claims, Defendant's refusal to manage the Plan according to levels of prudence and skill reasonably employed by TPAs and plan fiduciaries, and in Plaintiff's best interests. Defendant unreasonably failed or refused to uphold its duty to work in good faith to defray expenses of administering the Plan. Indeed, a reasonable fiduciary or TPA in Defendant's position and working to serve the Plan's interests would have more closely monitored the claims for this type of overpayment and would have recouped such overpayments for Plaintiff.

71.    **Causing Plaintiff to pay for the same medical claims or identical services multiple times**: Defendant enjoyed unfettered discretion to (i) "determine claims for benefits under the Plan"; (ii) determine the scope of benefits due to participants and beneficiaries; (iii) necessarily determine the number of units of care for which Plaintiff would pay; (iv) determine the methodology used to calculate the amount Plaintiff would pay for claims; and (v) identify and recover overpayments and to re-adjudicate claims. *Supra* ¶¶ 39, 41, 50-52. Thus, this alleged misconduct falls within the scope of Defendant's fiduciary duty. While the number of claims that apply to this allegation are too voluminous to identify in detail here, Plaintiff provides examples in **Ex. D**, attached hereto and filed under seal.

72.    This practice could only injure Plaintiff. There is no reasonable justification for this practice or argument that this benefited Plaintiff or Plan administration. Given the data and information Defendant possessed—which it concealed from Plaintiff—Defendant could easily have identified these overpaid claims. However, Defendant knew that properly monitoring claims for these defects would decrease its profit margin. Despite owing a duty to Plaintiff, Defendant did not care about these overpaid claims because it used Plaintiff's money to pay those claims—not its own money. Alternatively, these failures are the result of Defendant's failure or conscious refusal to manage the Plan according to levels of prudence and skill reasonably employed by TPAs and plan fiduciaries, and from failing to serve Plaintiff's best interests—including without limitation working to decrease expenses of administering the Plan. Indeed, a reasonable fiduciary or TPA in Defendant's position— working to serve Plaintiff's interests—would have more closely monitored the claims for this type of overpayment and would have prevented or recovered such overpayments for Plaintiff. Defendant, however, did not.

73.    **Improperly classifying affordable generic drugs as specialty pharmaceuticals, which resulted in Plaintiff paying excessive prices—or receiving less return in discounts and rebates—for generic drugs prescribed to Plan participants and beneficiaries, and paid by Plaintiff**: Defendant possessed and exercised full, unfettered discretion to (i) "determine claims for benefits under the Plan"; (ii) interpret the terms of the Plan; (iii) determine how much Plaintiff would pay for claims, including prescription claims; (iv) unilaterally commit Plaintiff's money to claims; and (v) identify and recover overpayments for claims, including prescription claims. *Supra* ¶¶ 39, 40, 43,

32

45, 47, 50-52. Determining whether a drug is covered by the Plan and how much of Plaintiff's money to commit to paying for a prescription claim necessarily involves discretion with respect to classifying drugs as expensive specialty drugs or as inexpensive generic, non-specialty drugs. *See* **Ex. A** at 41 (definition of "specialty"). Thus, this allegation of misconduct falls within the scope of Defendant's fiduciary duty.

74. "Specialty drugs" are exponentially more expensive than generic drugs. While a generic drug may technically qualify as "specialty," as the ASA makes clear, there must be something "special" about those drugs, such as requiring "special handling, storage, and shipping requirements." **Ex. A** at 41. However, on numerous claims, Defendant paid exponentially more for generic drugs with Plaintiff's money that did not qualify as a specialty drug. In other words, the only thing "special" about those generic drugs was the price Defendant paid for the drug with Plaintiff's money. For instance, imatinib is a generic cancer growth blocker that can easily be obtained for approximately $50 per prescription or less.[19] Using Plaintiff's money, Defendant paid exponentially more for imatinib prescriptions even though imatinib did not in any way qualify as a specialty drug for those prescriptions. There is a reason Defendant does this: payments go to PBMs that are Defendant's sister companies and affiliates. While this relationship is disclosed in certain agreements, Defendant and/or its affiliates unfairly profited from the built-in conflict of interest because Defendant permitted its affiliate PBMs to charge Plaintiff sometimes thousands of dollars for otherwise cheap generic drugs improperly

---

[19] https://www.costplusdrugs.com/medications/imatinib-400mg-tablet/, last visited Feb. 6, 2025.

characterized as "specialty" given they do not fit any definition of specialty drug. Plan data that Plaintiff has been able to review to date show that Anthem caused the Plan to pay tens of thousands of dollars more for imatinib prescriptions than the NADAC value for these same prescriptions.[20] This is just one example.

75.     Even setting aside the classification issue, Defendant overcharged for generic prescriptions. Given the breadth of claims that Defendant's misconduct affected and the impracticability of identifying all such claims in this Complaint, Plaintiff offers examples in **Ex. D**, attached hereto and filed under seal. These are just examples of numerous claims whereby Defendant, using Plaintiff's money, paid its pharmacies exponentially more for prescriptions than the price paid by the pharmacies. Given the maximum markup for prescription drugs generally does not exceed 20% and considering the average wholesale price pharmacies pay for these drugs, Defendant habitually paid exponentially more for drug claims with Plaintiff's money than a fiduciary or TPA exercising the care, skill, prudence, and diligence of a reasonably prudent fiduciary or TPA would have. Even more, Defendant overpaid prescription claims with Plaintiff's money because Defendant's arrangements with its PBM and network pharmacies (i) allowed Defendant to be paid kickbacks from those overpayments; (ii) allowed for Defendant's network providers to be overpaid by Plaintiff in exchange for more favorable arrangements for Defendant in its fully insured segment; and (iii) allowed for Defendant-affiliated PBMs to receive excessive

---

[20] "NADAC" refers to the national average drug acquisition cost, which was jointly developed by the Centers for Medicare and Medicaid Services and calculates the average price that pharmacies pay for prescription drug. This sum refers to the *average* cost that prescription retailers in the U.S. pay for the drug at issue for the time relevant to the claim.

payment for these drugs. Defendant and its affiliates therefore profited from its practice of overpaying prescription claims with Plaintiff's money. Alternatively, these failures are the result of Defendant's failure to manage and administer the Plan and its assets according to levels of prudence and skill reasonably employed by TPAs and plan fiduciaries, and in Plaintiff's best interests—including without limitation working to decrease expenses of administering the Plan. Indeed, a reasonable fiduciary or TPA in Defendant's position and working to serve Plaintiff's interests would have more closely monitored the claims for this type of overpayment and would have prevented and recovered such overpayments for the Plan or worked with providers and the PBM to eliminate the excess charges.

76.     **Withholding pharmaceutical rebates from Plaintiff, thereby reducing Plaintiff's assets and effectively causing overpayment of claims**: Defendant enjoyed unfettered discretion and control over (i) "determin[ing] claims for benefits under the Plan"; (ii) determining how much Plaintiff would pay for claims, including prescription claims; (iii) committing Plaintiff's money to pay claims; (iv) creating and using relationships with others (including prescription intermediaries and PBMs who obtain rebates and discounts) to control, manage, and administer the Plan and Plaintiff's expenditures; and (v) recovery of overpayments by Plaintiff. *Supra* ¶¶ 39, 40, 43, 45, 47. 50-52, **Ex. A** at 12, art. 14.a.1. This misconduct therefore falls within the scope of Defendant's fiduciary duty.

77.     Consistent with its fiduciary duty, Defendant agreed to pay 100% of drug rebates generated by Plan claims. *See, e.g.*, **Ex. A** at 19. Further, because the Plan's prescription claims generated those rebates, Defendant would have paid 100% of the drug

rebates to Plaintiff had it acted as a reasonable fiduciary or TPA or as a fiduciary or TPA attempting in good faith to defray the Plan's healthcare costs. Defendant improperly retained a portion of drug rebates generated by the Plan and permitted its affiliated PBMs to retain a portion of these rebates. Defendant then falsely reported to Plaintiff that Plaintiff received all rebates. In doing so, Defendant breached the ASA; placed its own interests above Plaintiff's; failed to act with reasonable care, prudence and diligence given the circumstances; and failed to act for the exclusive purpose of serving Plaintiff, including limiting the expenses of administering the Plan. Indeed, a reasonably prudent and loyal TPA in Defendant's position would have passed on 100% of drug rebates to Plaintiff.

78.    **Using Plaintiff's funds to pay more for prescriptions than charged by providers—a practice called "spread pricing"—which caused Plaintiff to pay significantly more for prescription drugs while allowing Defendant or its affiliates to retain the excess**: Defendant possessed and exercised full, unfettered discretion to (i) "determine claims for benefits under the Plan"; (ii) interpret the terms of the Plan; (iii) determine how much Plaintiff would pay for claims, including prescription claims; (iv) determine whether and how to monitor for overpayments and whether and how to recover overpayments; (v) commit Plaintiff's money to pay claims; and (vi) determine the methodology used to identify amounts it would pay for claims with Plaintiff's money. *Supra* ¶¶ 39, 40, 41, 45, 47, 50-52. This allegation therefore falls within the scope of Defendant's fiduciary duty.

79.    "Spread pricing" in this context refers to Defendant's practice of paying more for prescription claims with Plaintiff's money than what was paid to the provider.

Defendant does not provide pass-through pricing, which is reasonably feasible and would benefit Plaintiff by limiting cost of claims. Defendant does not even monitor the percentage of Plaintiff's money that goes to the cost of the prescriptions as opposed to the fees imposed by Defendant's affiliates that it permits to unnecessarily serve as intermediaries. As a result, these intermediaries, including Defendant's affiliates serving as PBMs, unreasonably inflated prescription claims with undisclosed, excessive fees to Plaintiff's detriment. There is no reasonable argument that spending more of Plaintiff's money for prescription claims than was paid to providers was for Plaintiff's benefit. Moreover, the amount of the spread retained by Defendant and its affiliated intermediaries was excessive. Even assuming pass-through pricing were not feasible, a reasonably prudent and loyal TPA or fiduciary working to defray costs and in Defendant's position would have (i) arranged for the Plaintiff to pay a transparent, per-claim fee to the PBM or other intermediaries instead of permitting its affiliated PBM and intermediaries to charge hidden, concealed, excessive, and fluctuating fees on a per-claim basis; (ii) refrained from collecting portions of those spread pricing excesses for its own benefit and to Plaintiff's detriment; and (iii) reported the amount of spread pricing excesses generated by the Plan's prescription claims. Defendant did none of this.

80.    **Steering, requiring, or otherwise encouraging Plan participants and beneficiaries to use Defendant-affiliated providers and intermediaries who charged more for the same or lesser quality of care and who passed on the excess of these payments to Defendant or its affiliated companies**: Defendant enjoyed unfettered discretion to (i) "determine claims for benefits under the Plan"; (ii) interpret the terms of

37

the Plan; (iii) determine the scope of benefits; (iv) determine the methodology used to calculate amounts Defendant would pay on claims with Plaintiff's money; and (v) determine whether and how to identify and recover overpayments by Defendant with Plaintiff's money. *Supra* ¶¶ 39, 41, 42, 50-52. By channeling Plan participants and beneficiaries to particular providers who Defendant knew would overcharge Plaintiff because of their relationship with Defendant, Defendant violated its fiduciary duty by abusing the trust and discretion it had with respect to the Plan and Plaintiff's assets.

81.     One way Defendant perpetrated this misconduct was by naming its affiliates as PBMs, who charged Plaintiff more for prescriptions than competitors and who retained rebates that rightfully belong to Plaintiff. Defendant therefore steered *every* prescription claim through its affiliated PBMs, which overcharged for prescriptions, withheld rebates, and engaged in deceptive spread pricing as alleged above. Another way Defendant carried out this misconduct was by punishing Plaintiff if it failed to designate Defendant and its affiliates as exclusive specialty drug providers. *See* **Ex. A** at 40. Thus, Defendant steered all the Plan's specialty drug prescription claims to itself, and as provided above, it abused this role by improperly deeming everyday generics as "specialty" drugs in order to charge Plaintiff exponentially more than those drugs would otherwise cost. Moreover, Defendant advertises on behalf of its affiliated providers and others willing to give something in return to Defendant (such as better discounts for Defendant's fully insured segment and kickbacks) to participants and their beneficiaries but not for providers that are not affiliated with Defendant or who are unwilling to give something in return. Those providers charge

Plaintiff more than what other similarly situated and capable providers would charge for the same service.

82.    **Knowingly or negligently engaging intermediaries between Defendant and providers who required payment well in excess of providers' charges and pocketing the difference paid by Plaintiff**: Defendant exercised full discretion (i) to "determine claims for benefits under the Plan"; (ii) interpret the terms of the Plan; (iii) to determine how much Plaintiff would pay for claims; (iv) determine whether and how to identify overpayments and whether and how to recover overpayments; and (v) commit Plaintiff's money to pay claims. *Supra* ¶¶ 39, 40, 43, 45, 47, 50-52. This misconduct falls within the scope of Defendant's fiduciary duty.

83.    **Failing to meet discount and rebate guarantees for prescription drug claims and otherwise failing to secure reasonably available discounts and rebates for prescription drug claims**: Defendant possessed and exercised full, unfettered discretion to (i) "determine claims for benefits under the Plan"; (ii) interpret the terms of the plan; (iii) determine how much Plaintiff would pay each claim; (iv) unilaterally commit Plaintiff's money to claims; (v) determine the methodology used to determine the amount Plaintiff would pay for claims; and (vi) to determine whether and how to identify overpayments and whether and how to recover overpayments. *Supra* ¶¶ 39, 40, 41,43. 45, 47, 50-52. This misconduct therefore falls within the scope of Defendant's fiduciary duty.

84.    Defendant failed to secure discounts and rebates reasonably available, guaranteed by the ASA, or both. Defendant's failure to secure reasonable and/or agreed

upon discounts applies both to the aggregate of prescription claims and in the exemplar claims identified in **Ex. D**, attached to this Complaint and filed under seal.

85.     To the extent Defendant relies on contract language to excuse its misconduct, Defendant likewise failed to meet those discount and rebate guarantees. *See* **Ex. A** at 40-41; **Ex. C** at 40-41. Perhaps the most egregious example was generic discounts, which were meant to exceed 82% at times to which this Complaint applies. The data made available to Plaintiff shows that Defendant failed to meet that standard.

86.     **Paying for services not actually provided, which could have been detected with reasonable prudence and effort**: Defendant wielded unfettered discretion to (i) "determine claims for benefits under the Plan"; (ii) interpret the terms of the Plan; (iii) determine how much of Plaintiff's money Defendant would commit to pay claims; and (iv) determine whether and how to identify such overpayments and whether and how to recover such overpayments. *Supra* ¶¶ 39, 40, 41, 45, 47. This misconduct therefore falls within the scope of Defendant's fiduciary duty. No reasonable, loyal fiduciary or TPA in Defendant's position would use Plaintiff's money to pay claims for services or prescriptions not provided. With the information that Defendant possessed—and refused to share with Plaintiff—Defendant could have readily identified these claims and associated overpayments. Healthcare provider coders routinely enter service codes for services and treatment that were not actually provided. Likewise, providers routinely overcharge based on those errors. Defendant knows this given its vast experience in the industry. In its fully insured segment, Defendant has systems in place that identify these coding errors and either avoid or recover overpayments. But because the Plan is self-

funded, Defendant simply opts not to use these systems because its own money is not at risk and because those systems present a cost that would decrease Defendant's net revenue earned through its management and administration of the Plan. Defendant also knows that these improper claims can be identified by reviewing itemized bills and medical charts. Defendant failed to prevent, identify, or remedy these overpayments because (i) Defendant sought to protect its own bottom line by avoiding any added expense necessary to take such actions; (ii) Defendant benefits from such overpayments through kickbacks or more favorable arrangements with these providers in its fully insured segment; (iii) Defendant failed its duty to act with the care, skill, and diligence of a reasonably prudent TPA or fiduciary in similar circumstances. Through these failures, Plaintiff overpaid on numerous claims, and Plaintiff could not recover those overpayments from providers.

87. **Protecting its fully insured segment—where Defendant pays claims from its own assets—by securing less favorable discount arrangements with network providers for Plaintiff in exchange for more favorable discounts in Defendant's fully insured segment**: Defendant enjoyed absolute discretion in (i) "determin[ing] claims for benefits under the Plan"; (ii) interpreting the terms of the Plan; (iii) determining whether and how to identify overpayments and whether and how to recoup overpayments on behalf of Plaintiff; (iv) determining how much of Plaintiff's money Defendant would commit to pay specific claims; and (v) designating in-network healthcare providers for the Plan, including the terms that would govern the relationship between the Plan and in-network providers and the amounts Plaintiff would pay those providers for healthcare. *Supra* ¶¶ 39,

40, 41, 42, 43, 45, 47, 50-52. Defendant's misconduct therefore falls within the scope of its fiduciary role.

88.    With respect to Defendant's fully insured plans, Defendant partially bears the risk that amounts paid for total claims will exceed Defendant's expectations because Defendant is responsible for paying claims with its own money less premiums paid by insureds. But because the Plan is self-funded, Defendant bears no risk because it pays claims with Plaintiff's money. Disregarding its various duties to Plaintiff, Defendant arranged for Plaintiff to pay Defendant's network providers more for claims from the Plan's self-funded coffers than Defendant agreed to pay the same network providers for identical services under Defendant's fully insured plans. By intentionally or negligently failing to secure reasonably available and favorable rates for Plaintiff, Defendant failed to act as a fiduciary or TPA exercising the care, skill, prudence, and diligence that a reasonably prudent fiduciary or TPA would have. Even more, through this practice, Defendant enhanced its profits in its fully insured segment because its network providers agreed to more favorable discount arrangements merely as a quid pro quo for Defendant committing Plaintiff to pay its network providers more with Plaintiff's money. Defendant appears primed to argue that because it harms all self-funded plans it manages through this practice, this is just a "business practice" that cannot support an ERISA claim. But ERISA does not forgive unlawful conduct simply because a fiduciary commits that misconduct as part of a core business strategy. Defendant placed its own interests above Plaintiff's by paying more to providers with Plaintiff's money than it reasonably needed to in order to secure more favorable network arrangements in its fully insured segment. This misconduct

42

further demonstrates that Defendant could have secured much more favorable discounts for Plaintiff but simply chose not to or negligently failed to. A loyal, reasonably prudent fiduciary or TPA in Defendant's position would have secured better discounts for Plaintiff and at least matched what Defendant achieved for itself in fully insured plans. As a result of this negligent, self-serving conduct, Plaintiff paid more on claims than it should have, and Defendant profited from this injury to Plaintiff.

89. **Improperly paying claims for outpatient services for inpatient patients that should not have been billed because those billed outpatient services were paid as part of inpatient services**: Defendant had unfettered control and discretion over (i) "determin[ing] claims for benefits under the Plan"; (ii) interpreting the terms of the Plan; (iii) determining how much Plaintiff would pay for claims; (iv) determining eligibility for benefits and scope of benefits; (v) determining whether and how to review claims for coding errors and overpayment and whether and how to recover overpayments; and (vi) determining the methodology for calculating the amount of Plaintiff's money Defendant would commit and use to pay claims. *Supra* ¶¶ 39, 40, 41, 45, 46, 47, 43, 50-52. Defendant's misconduct therefore falls within the scope of its fiduciary duty. In **Ex. D**, attached hereto and filed under seal, Plaintiff offers a few examples of outpatient claims that Defendant caused Plaintiff to pay while the patient was inpatient at a medical facility.

90. General billing and coding guidelines and principles prohibit the practice of charging for outpatient services for inpatient patients. Standards governing ERISA fiduciaries and TPAs prohibit them from paying such miscoded bills and claims with plan money—especially when the coding errors increase the plan's cost as is the case here. But

43

Defendant paid such claims with Plaintiff's money, improperly charging Plaintiff for outpatient services rendered to inpatient patients. By paying for outpatient services rendered to inpatient patients, Defendant overpaid with Plaintiff's money because those claims would have been less had they been billed and adjudicated as inpatient only. Defendant's payment of such claims and failure to monitor the bills to avoid these overpayments fell short of what a reasonably prudent and loyal fiduciary or TPA would do. A reasonably prudent and loyal fiduciary or TPA in similar circumstances would monitor claims for these errors, identify those errors, and recover overpayments. A reasonably prudent and loyal fiduciary or TPA would report to Plaintiff the number of nonconforming claims and the amounts of overpayments. Defendant did none of this. Moreover, Defendant simply paid these claims with Plaintiff's money because Defendant put its own interests above Plaintiff's; had Defendant spent the resources to monitor these claims and correct them, Defendant's profit margin would fall with respect to its work for Plaintiff. Thus, Defendant did not attempt to monitor or correct these claims or recover these overpayments. Defendant also refrained from correcting or remedying this problem to protect its favorable relationship with providers in its fully insured segment; forcing providers to correct their bills or refund overpayments to Plaintiff would sour Defendant's relationship with providers. Thus, Defendant ignored and concealed these known overpayments to protect its bottom line to Plaintiff's detriment.

91.     **Paying claims that were coded incorrectly or which violated internal or external billing and coding rules or guidelines despite the fact that Defendant either knew those claims were coded incorrectly or would have known had it exercised**

44

**reasonable care and placed Plaintiff's interest above its own**: Defendant had unfettered control and discretion over (i) "determin[ing] claims for benefits under the Plan"; (ii) interpreting the terms of the Plan; (iii) determining how much Plaintiff would pay for claims; (iv) determining eligibility for benefits and scope of benefits; (v) determining whether and how to review claims for coding errors and overpayment and whether and how to recover overpayments; and (vi) determining the methodology for calculating the amount of Plaintiff's money Defendant would commit and use to pay claims *Supra* ¶¶ 39, 40, 41, 45, 46, 47, 43, 50-52. Defendant's misconduct therefore falls within the scope of its fiduciary duty.

92.    Defendant caused the Plan to pay numerous claims that violated coding and billing rules and guidelines, including National Correct Coding Initiative (**NCCI**[21]) rules and edits, and even Defendant's *own* rules and guidelines such as those set forth in Defendant's published medical policies, clinical guidelines, and provider manuals. Similarly, Defendant caused the Plan to pay provider services at amounts greater than the negotiated rates published in accordance with the Transparency in Coverage regulation. Given the volume of claims that fit this description, it is impracticable to identify them all. Plaintiff therefore provides the examples in **Ex. D**, attached hereto and filed under seal.

93.    A reasonable fiduciary or TPA in Defendant's position and exercising total control over the amount it pays for claims with Plaintiff's money would require bills paid

---

[21] NCCI is a program developed by the Centers for Medicare & Medicaid Services (CMS) to publish rules and guidelines to promote correct coding methodologies and control improper coding that leads to inappropriate payment in medical claims.

45

by Plaintiff to satisfy applicable coding and billing rules and standards, and would certainly not cause Plaintiff to pay providers for services at rates that exceeded Defendant's own negotiated rates with those providers, published in accordance with Transparency in Coverage regulations. Defendant paid claims with Plaintiff's money that were supported by improperly coded bills, which violated coding and billing rules and guidelines (including those published by NCCI and Defendant itself), or which exceeded the published negotiated rates between Defendant and providers. Specifically, by paying bills that violated internal and external billing and coding rules, or which exceeded Defendant's negotiated rates, Defendant increased the amount of Plaintiff's money that was used to pay such claims. Defendant's payment of such claims and failure to monitor the bills to avoid these overpayments fell short of what a reasonably prudent and loyal fiduciary or TPA would do. Moreover, Defendant simply paid these claims with Plaintiff's money, because Defendant put its own interests above Plaintiff's; had Defendant spent the resources to monitor these claims and correct them or refuse to pay them, Defendant's profit margin would fall with respect to its work for Plaintiff. Further, Defendant ignored these coding errors by its network providers in order to protect more favorable relationships with those providers in Defendant's fully insured segment.

94.    **Paying for multiple units of specific treatments in a given day when applicable coding rules and standards (such as NCCI rules and edits) prohibited multiple units in a given day**: Defendant had unfettered control and discretion over (i) "determin[ing] claims for benefits under the Plan"; (ii) interpreting the terms of the Plan; (iii) determining how much of Plaintiff's money Defendant would commit to pay for

46

claims; (iv) determining eligibility for benefits and scope of benefits; (v) determining whether and how to review claims for coding errors and overpayment and whether and how to recover overpayments; (vi) determining the methodology for calculating the amount of Plaintiff's money Defendant would commit and use to pay claims. *Supra* ¶¶ 39, 40, 41, 45, 46, 47, 43, 50-52. Defendant's misconduct therefore falls within the scope of its fiduciary duty. The number of claims supporting this allegation are too voluminous to include an explanation of each claim in this Complaint. Thus, Plaintiff offers the following examples of instances where Defendant used Plan funds to pay for multiple units of specific treatments in a single day despite generally accepted coding rules that prohibit multiple units in a single day. Plaintiffs provide examples in **Ex. D**, attached to this Complaint and filed under seal.

95.    Generally applicable coding standards (including NCCI rules and edits) limit the units of certain healthcare that may be billed in a given day or other period of time. A common example is physical therapy. Nevertheless, Defendant used Plaintiff's money to pay for multi-unit healthcare, which applicable coding standards prohibit in certain circumstances. Defendant's payment of such claims and/or its failure to monitor the invoices to avoid these overpayments fell short of what a reasonably prudent and loyal fiduciary or TPA would do. Moreover, Defendant simply paid these claims with Plaintiff's money, because Defendant put its own interests above Plaintiff's; had Defendant spent the resources to monitor these claims and correct them or refuse to pay them, Defendant's profit margin would fall with respect to its services for Plaintiff. A reasonably prudent and loyal fiduciary or TPA would have monitored claims for such overpayment and would have

47

refused to over-pay and recovered the excess payments caused by these easily identified excess bills. Defendant, while concealing the data and materials necessary to identify these errors from Plaintiff, could have readily and reasonably identified these errors and overpayments using claims data and information. Further, Defendant ignored these coding errors by its network providers in order to protect more favorable relationships with those providers in Defendant's fully insured segment.

96.    **Paying hospice charges beyond the acceptable timeframe without recertification**: Defendant had unfettered control and discretion over (i) "determin[ing] claims for benefits under the Plan"; (ii) interpreting the terms of the Plan; (iii) determining how much Plaintiff would pay for claims; (iv) determining eligibility for benefits and scope of benefits; (v) determining whether and how to review claims for coding errors and overpayment and whether and how to recover overpayments; and (vi) determining the methodology for calculating the amount of Plaintiff's money Defendant would commit and use to pay claims. *Supra* ¶¶ 39, 40, 41, 45, 46, 47, 43, 50-52. Defendant's misconduct therefore falls within the scope of its fiduciary duty.

97.    Medicare rules incorporated by the Plan and generally applicable industry standards required that patients approved for hospice care be recertified after being on hospice care for six months. This is because hospice care is generally available only for patients who suffer from a condition reasonably limiting life expectancy to within six months. With Plaintiff's money, Defendant paid hospice claims that were for hospice care extending beyond six months without the recertification that applicable standards require. Defendant's payment of such claims and failure to monitor the invoices to avoid these

48

overpayments fell short of what a reasonably prudent fiduciary or TPA would do. Moreover, Defendant simply paid these claims with Plaintiff's money because Defendant put its own interests above Plaintiff's; had Defendant spent the resources to monitor these claims and correct them or refuse to pay them, Defendant's profit margin would fall with respect to its work for Plaintiff. A reasonably prudent and loyal fiduciary or TPA would have monitored claims for such overpayment and failure to recertify and would have prevented and recovered the excess payments caused by these easily identified coding errors. Indeed, Defendant, while concealing the data and materials necessary to identify these errors from Plaintiff, could have readily identified these errors and overpayments using claims data and information. Further, Defendant ignored these coding errors by its network providers vis-à-vis Plaintiff's plan in order to protect more favorable relationships with those providers in Defendant's fully insured segment.

99.    **Through arrangements with MultiPlan and similar vendors as alleged above, causing Plaintiff to pay exorbitant, unreasonable fees to Defendant and vendors**: Defendant had unfettered discretion to (i) "determine claims for benefits under the Plan"; (ii) interpret the terms of the Plan; (iii) take control of Plaintiff's money and commit it to payment of claims; (iv) determine whether and how to identify and recover overpayments; and (v) determine the methodology used to calculate amounts Defendant would pay on each claim with Plaintiff's money, including out-of-network claims that involved MultiPlan and other vendors Defendant involved in its processing of out-of-network claims. *Supra* ¶¶ 39, 40, 41, 43, 45, 48, 50-52. This misconduct therefore falls within the scope of Defendant's fiduciary role. Defendant has alleged relevant misconduct above. *Supra* ¶¶ 66-67. Defendant engaged MultiPlan to negotiate discounts on medical claims from providers outside of Defendant's network. First, Defendant did not reasonably need to employ MultiPlan or other vendor to manage, administer, price, or adjudicate out-of-network claims. Thus, the portion of discounts retained by MultiPlan and other vendors on out-of-network claims was excessive. Second, Defendant—despite not doing any of this work and despite paying MultiPlan far less to secure these discounts—retained 50% of the discounts instead of passing those discounts to Plaintiff. MultiPlan charges approximately

5% of the discount as its fee on out-of-network claims. Thus, as a fiduciary and TPA not investing any effort or time in achieving these discounts, Defendant retained approximately 45% of the discount to the exclusion of Plaintiff. As a result, Plaintiff paid more on out-of-network claims than it should because Defendant pocketed an excessive proportion of the discount. A reasonably prudent and loyal fiduciary or TPA would have passed the total discounts to Plaintiff or, alternatively, far more than 50%. But Defendant saw this as an opportunity to receive exorbitant fees from Plaintiff on a per-claim basis for doing absolutely nothing.

100.    **Failing to inform Plaintiff of these actions and the costs these actions imposed on Plaintiff when doing so reduced Plaintiff's assets while enriching Defendant and its affiliated companies**: In addition to its fiduciary duty in connection with assets, determining benefits, and interpreting the terms of the plan, *e.g. supra* ¶¶ 39, 40, 45, 47, 50-52, Defendant also exercised absolute control over the information necessary for Plaintiff to identify Defendant's misconduct. *See, e.g.*, **Ex. A** at 10-11, art. 11.a, 11.b, 11.d, 12.d. Far from honoring its obligations of transparency and candor, for years, Defendant concealed the claims data from Plaintiff because it demonstrates (i) Defendant spends more of Plaintiff's money for medical and prescription claims than is reasonably necessary; (ii) Defendant knew Plaintiff would change to a different fiduciary/TPA if Plaintiff knew Defendant overspent Plaintiff's money on medical and prescription claims; and (iii) Defendant knew that so long as Plaintiff remained ignorant of Defendant's misconduct due to its concealment of its misconduct and withholding of claims data, Defendant would continue to receive kickbacks from providers and PBMs from those

51

overpayments, and would continue to enjoy inflated profits from its misconduct. Of course, Defendant concealed that information and its misconduct in order to prevent facing the legal, business, and reputational consequences of its misconduct.

**JURISDICTION AND VENUE**

101.    This is a fiduciary action brought by a plan fiduciary pursuant to ERISA. Thus, United States district courts enjoy subject matter jurisdiction over this dispute. 29 U.S.C. § 1132(e)(1); *see also* 28 U.S.C. § 1331 (federal question); *id.* § 1367 (supplemental jurisdiction).

102.    Venue is proper in this district and division because the Plan is administered in Richmond, Virginia, the relevant breaches occurred in Richmond, Virginia, and Defendant is headquartered in Richmond, Virginia. 29 U.S.C. § 1132(e)(2); 28 U.S.C. § 1391(b); E.D. Va. Loc. Civ. R. 3(B)(4). Those same grounds support this Court's exercise of personal jurisdiction over Defendant. Moreover, this case arises from Defendant's misconduct in Virginia; from an agreement or agreements negotiated, executed, and performable in Virginia and that designate Virginia law as governing state law; and from Defendant's contacts in Virginia which are described throughout this Complaint.

**CAUSE OF ACTION FOR ERISA VIOLATIONS**

103.    Plaintiff incorporates all other paragraphs in this Complaint as if fully restated here. Plaintiff specifically incorporates paragraphs alleging Defendant's fiduciary status and misconduct. *Supra* ¶¶ 39-52, 68-100.

104.    Under ERISA, Defendant is a Plan fiduciary as alleged above. *Supra* ¶¶ 39-52. Defendant expressly agreed to serve as a fiduciary with respect to (i) "determin[ing]

52

claims for benefits under the Plan"; (ii) "determin[ing] eligibility for benefits under the Plan"; (iii) "interpret[ing] the terms of the Plan"; and (iv) "perform[ing] its obligations and duties as expressed in [the ASA] . . . to the extent that its performance of such actions constitutes fiduciary action under ERISA." **Ex. A** at 4, art. 2.c. And as alleged above, Defendant wielded and exercised total discretion and control over the management and administration of the Plan and its assets. *See, e.g.*, *supra* ¶¶ 39, 40, 41, 43 45, 46, 47, 48, 50-52. The misconduct alleged in detail above, *supra* ¶¶ 68-100, and restated below falls within the broad scope of Defendant's fiduciary duties.[24]

105.    The Plan is an ERISA welfare benefit plan subject to the protections afforded by ERISA.

106.    Plaintiff Owens & Minor is a Plan fiduciary and the Plan's sponsor. Plaintiff Owens & Minor brings this claim on the Plan's behalf in Plaintiff's capacity as Plan sponsor and named fiduciary.

107.    Under ERISA, Defendant must discharge its duties to the Plan solely in the interest of Plan participants and beneficiaries and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries[] and defraying reasonable expenses of administering the plan." *See* 29 U.S.C. § 1104(a)(1). ERISA requires Defendant to discharge its duties with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like

---

[24] Note that paragraphs 68-100 connect the scope of Defendant's fiduciary status to particular misconduct.

53

aims . . . and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." *Id.* § 1104(a)(2).

108. Further, ERISA prohibits a fiduciary from dealing with assets of the plan in the fiduciary's "own interest or for [its] account." 29 U.S.C. § 1106(b). ERISA also prohibits Defendant from causing the Plan to engage in a transaction if Defendant knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the Plan. *Id.* § 1106(a)(1)(D).

109. Defendant has violated these duties as alleged above. *See supra* ¶¶ 68-100. Specifically, Defendant violated ERISA through the following misconduct:

    i. Causing the Plan to grossly overpay claims, including payments to certain providers exceeding 100% of charges actually billed by those providers, *supra* ¶¶ 69-70;

    ii. Causing the Plan to pay for the same medical claims or identical services multiple times, *supra* ¶¶ 71-72;

    iii. Improperly classifying affordable generic drugs as specialty pharmaceuticals, which resulted in the Plan paying excessive prices—or receiving less return in discounts and rebates—for generic drugs prescribed to Plan participants and beneficiaries, and paid by the Plan, *supra* ¶¶ 73-75;

iv.    Withholding pharmaceutical rebates from the Plan, thereby reducing the Plan's assets and effectively causing overpayment of claims, *supra* ¶¶ 76-77;

v.    Using Plan funds to pay more for prescriptions than charged by providers—a practice called "spread pricing"—which caused the Plan to pay significantly more for prescription drugs while allowing Defendant or its affiliates to retain the excess, *supra* ¶¶ 78-79;

vi.    Steering, requiring, or otherwise encouraging Plan participants and beneficiaries to use Defendant-affiliated providers and intermediaries who charged more for the same or lesser quality of care and who passed on the excess of these payments to Defendant or its affiliated companies, *supra* ¶¶ 80-81;

vii.    Knowingly or negligently engaging intermediaries between Defendant and providers who required payment well in excess of providers' charges and pocketing the difference paid by the Plan, *supra* ¶ 82;

viii.    Failing to meet discount and rebate guarantees for prescription drug claims and otherwise failing to secure reasonably available discounts and rebates for prescription drug claims, *supra* ¶ 83-85;

ix.    Paying for services not actually provided, which could have been detected with reasonable prudence and effort, *supra* ¶ 86;

x.    Protecting its fully insured segment—where Defendant pays claims from its own assets—by securing less favorable discount arrangements with

55

network providers for the Plan in exchange for more favorable discounts in Defendant's fully insured segment, *supra* ¶¶ 87-88;

xi. Improperly paying claims for outpatient services for inpatient patients that should not have been billed because those billed outpatient services were paid as part of inpatient services, *supra* ¶¶ 89-90;

xii. Paying claims that were coded incorrectly, which violated internal or external billing and coding rules and guidelines, or which exceeded Defendant's published negotiated rates with providers, despite the fact that Defendant either knew those claims were coded or billed incorrectly or would have known had it exercised reasonable care and placed the Plan's and its members' interests above its own, *supra* ¶¶ 91-93;

xiii. Paying for multiple or excessive units of specific treatments in a given day (or other period of time) when applicable coding rules and standards prohibited multiple, or more than a certain number of, units in a given day (or period of time), *supra* ¶¶ 94-95;

xiv. Paying hospice charges beyond the acceptable timeframe without recertification, *supra* ¶¶ 96-97;

xvi.    Through arrangements with MultiPlan and similar vendors as alleged above, causing the Plan to pay exorbitant, unreasonable fees to Defendant and vendors, *supra* ¶ 99;

xvii.    Failing to inform the Plan or its plan sponsor of these actions and the costs these actions imposed on the Plan when doing so reduced Plan assets while enriching Defendant and its affiliated companies, *supra* ¶ 100.

110.    With respect to prescription claims, Defendant's failure was extraordinary. For example, the Federal Supply Schedule publishes information on optimum returns on prescription costs that a TPA like Defendant can achieve in U.S. markets. Those optimum returns are approximately 26% according to that schedule. The U.S. Postal Service has published an audit of its own plan showing 29% returns to the plan for prescription costs. Through Defendant's failure to uphold its fiduciary duties, Plaintiff's Plan realized less than half of those returns on prescription claims.

111.    Whether Defendant's failures stem from negligence, conscious disregard for the Plan's interests, breach of the ASA, or even an intent to harm the Plan and enrich itself and its affiliates, Defendant's misconduct violates the duties imposed by ERISA.

112.    Defendant's self-dealing, neglect, and other misconduct has caused the Plan to lose at least tens of millions of dollars. Plaintiff expects its damage estimates to increase as it obtains and analyzes additional information through discovery. Defendant also improperly collected millions in ill-gotten gains from Plan funds.

57

## STATE LAW CAUSES OF ACTION[25]

113.    To the extent ERISA does not preempt relevant state law claims, Plaintiff alleges the following state law causes of action.

### I.    BREACH OF CONTRACT

114.    Plaintiff incorporates all other paragraphs in this Complaint as if fully restated here.

115.    Plaintiff further incorporates **Exhibits A-D** as if fully restated here.

116.    This claim is brought by Plaintiff Owens & Minor in its individual capacity and, alternatively, on behalf of the Plan.

117.    Plaintiff and Defendant are parties to the ASA and its related schedules and amendments.

118.    Defendant expressly agreed to serve as fiduciary with respect to the Plan's claims administration and payments either by expressly accepting "fiduciary" status under the ASA or by accepting the responsibility that came with the vast discretion Defendant enjoyed under the ASA over Plan administration and Plaintiff's assets. *Supra* ¶¶ 39-52. Defendant breached this promise by failing to serve the Plan or to protect Plaintiff's assets with the loyalty and care of a fiduciary. *Supra* ¶¶ 68-100.

119.    Defendant also agreed to certain discount guarantees for prescription drug claims. *See* **Ex. A** at 40-42; **Ex. C** at 40-41. Defendant breached these provisions by failing to secure the promised levels of discounts on individual claims and in the aggregate.

---

[25] As noted in Article 20 of the ASA, the ASA shall be construed according to the laws of Virginia, "except to the extent preempted by ERISA or any other applicable provisions of federal law."

58

120.    Defendant agreed to pass on 100% of prescription drug rebates to Plaintiff generated by Plan claims. **Ex. A** at 19; **Ex. C** at 31. Defendant violated this promise by failing to pass on the entirety of those rebates, retaining those rebates, or allowing its affiliated PBMs to retain those rebates.

121.    Moreover, Defendant agreed to adjudicate and process claims with at least 95% accuracy and failed to satisfy that contracted standard. *See, e.g.*, **Ex. C** at 12; **Ex. A** at 31. Moreover, Defendant did not pay Plaintiff what it owed for missing its targeted accuracy goals. Preliminary analysis on the limited data produced by Defendant reveals an error rate of at least 10%.

122.    As a result of Defendant's breaches, Plaintiff has suffered damages of at least tens of millions of dollars, an estimate which is likely to increase significantly as Plaintiff obtains and analyzes additional information through discovery.

## II.    BREACH OF IMPLIED CONTRACTUAL DUTY OF GOOD FAITH AND FAIR DEALING

123.    Plaintiff incorporates all other allegations in this Complaint as if fully restated here.

124.    This claim is brought by Plaintiff Owens & Minor in its individual capacity and, alternatively, on behalf of the Plan.

125.    Every agreement carries with it an implied duty of good faith and fair dealing. This implied duty applies even when a written contract provides the defendant discretion to perform a particular act.

59

126.    Defendant enjoyed and exercised discretion under the relevant agreements to determine claims for benefits under the Plan. *Supra* ¶¶ 39, 46. As set forth above in greater detail, Defendant exercised this discretion dishonestly and in bad faith. *See supra* ¶¶ 68-100. There was no rational basis supporting Defendant's misconduct. And the only reason Defendant committed this misconduct was to enrich itself and its affiliates and associates at Plaintiff's expense.

127.    Defendant enjoyed and exercised discretion under the relevant agreements to interpret the terms of the Plan. *Supra* ¶¶ 39. 46. As set forth above in greater detail, Defendant exercised this discretion dishonestly and in bad faith. *See supra* ¶¶ 69-70, 73-75, 78-100. There was no rational basis supporting Defendant's misconduct. And the only reason Defendant committed this misconduct was to enrich itself and its affiliates and associates at Plaintiff's expense.

128.    Defendant enjoyed and exercised discretion under the relevant agreements to determine amounts of Plaintiff's money Defendant would pay providers and others on claims. *Supra* ¶¶ 39, 40, 41, 45. As set forth above in greater detail, Defendant exercised this discretion dishonestly and in bad faith. *See supra* ¶¶ 68-99. There was no rational basis supporting Defendant's misconduct. And the only reason Defendant committed this misconduct was to enrich itself and its affiliates and associates at Plaintiff's expense.

129.    Defendant enjoyed and exercised discretion in determining which providers would provide healthcare to Plan participants and beneficiaries and the amounts of Plaintiff's money Defendant would pay those providers for claims. *Supra* ¶ 39, 42. As set forth above in greater detail, Defendant exercised this discretion dishonestly and in bad

60

faith. *See supra* ¶¶ 78-82, 87-88. Indeed, Defendant utterly failed to identify and recover overpaid amounts out of self-interest. There was no rational basis supporting Defendant's misconduct. And the only reason Defendant committed this misconduct was to enrich itself and its affiliates and associates at Plaintiff's expense.

130.    Defendant enjoyed and exercised discretion in determining whether to audit providers for and recover overpayments by Defendant with Plaintiff's money. *Supra* ¶¶ 39, 50-52. As set forth above in greater detail, Defendant exercised this discretion dishonestly and in bad faith. *See supra* ¶¶ 69-99. There was no rational basis supporting Defendant's misconduct. And the only reason Defendant committed this misconduct was to enrich itself and its affiliates and associates at Plaintiff's expense.

131.    Defendant also enjoyed control and discretion under the agreements over sums it or its affiliates retained from the difference of amounts paid by Defendant with Plaintiff's money for prescription drugs and the amount actually invoiced for prescription drugs. *Supra* ¶¶ 39, 42, 43. As set forth above in greater detail, Defendant exercised this discretion dishonestly and in bad faith. *See supra* ¶¶ 73-81, 83-86. There was no rational basis supporting Defendant's misconduct. And the only reason Defendant committed this misconduct was to enrich itself and its affiliates and associates at Plaintiff's expense.

132.    Defendant possessed and exercised unfettered discretion under the agreements on what to charge Plaintiff for out-of-network claims. *Supra* ¶¶ 39, 48, 66-67. As set forth above in greater detail, Defendant exercised this discretion dishonestly and in bad faith. *See supra* ¶ 99. There was no rational basis supporting Defendant's misconduct.

61

And the only reason Defendant committed this misconduct was to enrich itself and its affiliates and associates at Plaintiff's expense.

133.    Defendant possessed and exercised unfettered discretion under the agreements to recover overpayments. *Supra* ¶¶ 50-52. As set forth above in greater detail, Defendant exercised this discretion dishonestly and in bad faith. *See supra* ¶¶ 69-99. There was no rational basis supporting Defendant's misconduct. And the only reason Defendant committed this misconduct was to conceal its misconduct and to enrich itself and its affiliates and associates at Plaintiff's expense.

134.    Defendant possessed and exercised unfettered discretion over release of information Plaintiff needed to identify fraud, waste, abuse, and overpayments. **Ex. A** at 10-11, art. 11.a, 11.b, 11.d, 12.d. As set forth above in greater detail, Defendant exercised this discretion dishonestly and in bad faith. *See supra* ¶¶ 21-28, 100. There was no rational basis supporting Defendant's misconduct. Indeed, Defendant concealed the data from Plaintiff (and still does) in order to avoid the business, legal, and reputational consequences of its misconduct. And the only reason Defendant committed this misconduct was to enrich itself and its affiliates and associates at Plaintiff's expense.

135.    As a result of Defendant's breach of its implied duty of good faith and fair dealing, Plaintiff has suffered damages of at least tens of millions of dollars.

### III.    BREACH OF FIDUCIARY DUTY

136.    Plaintiff incorporates all other allegations in this Complaint as if fully restated here.

62

137.    This claim is brought by Plaintiff Owens & Minor in its individual capacity and, alternatively, on behalf of the Plan.

138.    In managing and exercising total control over Plaintiff's money, Defendant owed Plaintiff a fiduciary duty under Virginia law. Plaintiff entrusted Defendant to hold, manage, control, and protect Plaintiff's assets and to commit them fairly and accurately to pay valid bills for healthcare and prescriptions. Plaintiff's money was managed and controlled in trust by Defendant for the purpose of paying healthcare bills of Owens & Minor employees and their beneficiaries. Defendant accepted and acknowledged that Defendant would occupy a position of trust in numerous respects. *Supra* ¶¶ 39-52.

139.    As noted above, Defendant had near boundless discretion to determine how much of Plaintiff's money to commit to paying medical bills. *See, e.g., supra* ¶¶ 39, 40, 41, 42, 45. No contract provision defined the precise amounts Defendant would pay for healthcare bills. No contract provision defined Defendant's duty to disclose the specific conflicts of interest at issue here or to refrain from acting according to those conflicts. No contract provision precisely defined Defendant's duty to recover overpayments. To any extent Defendant avers the audit provisions provided for such recovery, Defendant's unfettered, open-ended discretion to determine the method of the audits and to determine which overpayments to recover rendered those provisions illusory, ambiguous, or both. No contract provision precisely defined Defendant's duty to disclose information to Plaintiff sufficient for Plaintiff to determine whether Defendant had committed fraud, waste, and abuse with respect to Plaintiff's assets. These matters were left for Defendant to decide given the position of trust and fiduciary role it filled.

63

140. Despite holding this position of trust, Defendant breached that trust and its fiduciary duties by overpaying claims to benefit itself and its affiliates and associates, *e.g.*, *supra* ¶¶ 69-75, 78-98; by concealing its misconduct, *e.g.*, *id.* ¶¶ 100; and by failing to recover overpayments and rebates, *e.g.*, *id.* ¶¶ 73-77, 98. As a result, Defendant spent more of Plaintiff's money on healthcare claims than it would have had it upheld its fiduciary duty.

141. As set forth above, Defendant acted in bad faith, managed and spent Plaintiff's money unreasonably, used Plaintiff's money to self-deal, and acted pursuant to conflicts of interest, including Defendant's own desire to use Plaintiff's money to generate revenue for Defendant and its affiliates and associates that was not disclosed in the relevant agreements. Specifically, Defendant violated its fiduciary duties by:

    i.    Causing Plaintiff to grossly overpay claims, including payments to certain providers exceeding 100% of charges actually billed by those providers, *supra* ¶¶ 69-70;

    ii.    Causing Plaintiff to pay for the same medical claims or identical services multiple times, *supra* ¶¶ 71-72;

    iii.    Improperly classifying affordable generic drugs as specialty pharmaceuticals, which resulted in Plaintiff paying excessive prices—or receiving less return in discounts and rebates—for generic drugs prescribed to Plan participants and beneficiaries, and paid by Plaintiff, *supra* ¶¶ 73-75;

iv.    Withholding pharmaceutical rebates from Plaintiff, thereby reducing Plaintiff's assets and effectively causing overpayment of claims, *supra* ¶¶ 76-77;

v.    Using Plaintiff's funds to pay more for prescriptions than charged by providers—a practice called "spread pricing"—which caused Plaintiff to pay significantly more for prescription drugs while allowing Defendant or its affiliates to retain the excess, *supra* ¶¶ 78-79;

vi.    Steering, requiring, or otherwise encouraging Plan participants and beneficiaries to use Defendant-affiliated providers and intermediaries who charged more for the same or lesser quality of care and who passed on the excess of these payments to Defendant or its affiliated companies, *supra* ¶¶ 80-81;

vii.    Knowingly or negligently engaging intermediaries between Defendant and providers who required payment well in excess of providers' charges and pocketing the difference paid by Plaintiff, *supra* ¶ 82;

viii.    Failing to meet discount and rebate guarantees for prescription drug claims and otherwise failing to secure reasonably available discounts and rebates for prescription drug claims, *supra* ¶ 83-85;

ix.    Paying for services not actually provided, which could have been detected with reasonable prudence and effort, *supra* ¶ 86;

x.    Protecting its fully insured segment—where Defendant pays claims from its own assets—by securing less favorable discount arrangements with

65

network providers for Plaintiff in exchange for more favorable discounts in Defendant's fully insured segment, *supra* ¶¶ 87-88;

xi. Improperly paying claims for outpatient services for inpatient patients that should not have been billed because those billed outpatient services were paid as part of inpatient services, *supra* ¶¶ 89-90;

xii. Paying claims that were coded incorrectly, which violated internal or external billing and coding rules and guidelines, or which exceeded Defendant's published negotiated rates with providers despite the fact that Defendant either knew those claims were coded or billed incorrectly or would have known had it exercised reasonable care and placed Plaintiff's and Plan members' interests above its own, *supra* ¶¶ 91-93;

xiii. Paying for multiple or excessive units of specific treatments in a given day (or other time period) when applicable coding rules and standards prohibited multiple, or more than a certain number of, units in a given day (or time period), *supra* ¶¶ 94-95;

xiv. Paying hospice charges beyond the acceptable timeframe without recertification, *supra* ¶¶ 96-97;

xvi.    Through arrangements with MultiPlan and similar vendors as alleged above, causing Plaintiff to pay exorbitant, unreasonable fees to Defendant and vendors, *supra* ¶ 99;

xvii.    Failing to inform Plaintiff of these actions and the costs these actions imposed on Plaintiff when doing so reduced Plaintiff's assets while enriching Defendant and its affiliated companies, *supra* ¶ 100.

142.    As a result of these violations, Plaintiff has suffered damages of at least tens of millions of dollars.

## IV.    FRAUDULENT FAILURE TO DISCLOSE

143.    Plaintiff incorporates all other allegations in this Complaint as if fully restated here.

144.    This claim is brought by Plaintiff Owens & Minor in its individual capacity and, alternatively, on behalf of the Plan.

145.    As alleged above, Plaintiff relied on Defendant completely to determine how much Plaintiff would pay on healthcare claims. *See, e.g., supra* ¶¶ 39, 40, 41, 42, 45. Plaintiff relied on Defendant completely to interpret the Plan and to ensure the Plan was managed in a way that prevented fraud, waste, and abuse. *See also supra* ¶¶ 15-17, 32. Defendant freely accepted and agreed to undertake this position of trust. *Supra* ¶¶ 39-52. Defendant therefore owed a duty to disclose to Plaintiff the information it needed to (i) identify fraud, waste, and abuse in Defendant's management of Plaintiff's Plan and money and (ii) clarify and understand Defendant's reports on Plan performance and Defendant's expenditures of Plaintiff's money.

146. Defendant knew that Plaintiff assumed it was receiving reasonably available discounts from providers and rebates from prescription claims. Defendant knew that Plaintiff assumed Defendant's only form of payment for its management of the Plan and Plaintiff's money was disclosed by the ASA. Defendant knew that Plaintiff assumed Defendant was classifying prescription claims—including the generic-versus-specialty classification described above—in a manner that was faithful to the truth and was in Plaintiff's interest. *Supra* ¶¶ 73-74. Defendant concealed its misconduct and its motives for misconduct alleged above. *See supra* ¶¶ 21-28, 100. Defendant concealed these facts in an effort to (i) retain Plaintiff as a customer; (ii) prevent reputational harm that would result if the public and other plan sponsors knew of Defendant's double-dealing, neglect, and double-dipping; (iii) retain the quid pro quo bargains from providers alleged above that benefitted Defendant to Plaintiff's detriment; and (iv) preserve the ability to enrich itself and its affiliated companies through kickbacks and improperly retained rebates.

147. Had Defendant revealed its harmful self-serving misconduct, Plaintiff would have terminated Defendant immediately. But as a result of Defendant's fraudulent concealment and omissions, Plaintiff employed Defendant to manage the Plan and Plaintiff's money and continued to employ Defendant for several years. As a result of Defendant's fraudulent concealment and omissions, Plaintiff was unable to protect itself and its assets from Defendant's misconduct. During the time of Defendant's fraudulent concealment, Defendant overspent Plaintiff's money for claims and was unjustly enriched through quid pro quo dealings and retention of ill-gotten money for itself and its affiliates

68

and associates as alleged above. *Supra* ¶¶ 68-100. Thus, Defendant harmed Plaintiff through this fraudulent concealment and was unjustly enriched.

148. As a result of Defendant's fraudulent omissions, Plaintiff employed Defendant as the Plan's TPA and retained its "services" from 2017 to 2023. During that same time period, Defendant caused Plaintiff to incur tens of millions of dollars in losses by virtue of its misconduct detailed above. Defendant has also retained monies it received by virtue of its fraud.

## V.   NEGLIGENCE

149. Plaintiff incorporates all other allegations in this Complaint as if fully restated here.

150. This claim is brought by Plaintiff Owens & Minor in its individual capacity and, alternatively, on behalf of the Plan.

151. This cause of action assumes in the alternative that Defendant did not intentionally carry out the misconduct alleged above. *See supra* ¶¶ 68-100.

152. Defendant engaged PBMs and its network providers to provide healthcare and prescription products to those whom Defendant allowed to use its network. Relevant here, Defendant also paid its PBMs and network providers with Plaintiff's money. Defendant used Plaintiff's money to pay its PBMs and network providers for services and prescriptions. As Plaintiff's agent for this purpose, Defendant owed a duty to monitor and supervise its PBMs and providers with respect to their coding and billing of claims submitted to ERISA and non-ERISA healthcare plans.

153.    With respect to all circumstances where Defendant used Plaintiff's money to pay its contracted PBMs and providers, Defendant owed a duty of care to supervise and monitor its non-fiduciary PBMs and network providers to prevent overbilling, retention of rebates due and owing to Plaintiff, and coding errors. Defendant knew or should have known that its failure to monitor and supervise these agents, affiliates, and associates would increase costs to Plaintiff. As alleged above, these non-fiduciary actors, who acted under and subject to Defendant's control and supervision, submitted bills to Plaintiff for miscoded charges, charges that were grossly excessive, and charges that entitled Plaintiff to discounts and rebates that these non-fiduciary PBMs and network providers improperly failed to honor. *Supra* ¶¶ 68-79, 82-86, 89-97, 100. As a result of Defendant's failure to monitor and correct those bills—and its failure to identify and rectify overpayments and improperly retained rebates—Defendant harmed Plaintiff. *Id.*

154.    For purposes of this claim, Plaintiff does not allege that certain services should or should not have been provided under the Plan. But these non-fiduciary actors' actions did cause Plaintiff to pay more than it should have. And Defendant's failure to supervise its nonfiduciary PBMs and network providers by reviewing and ordering the correction of the bills they submitted to Plaintiff caused Plaintiff to pay more than it otherwise would have. A reasonable TPA in Defendant's position—in paying bills submitted by its agents, affiliates, and associates for Defendant's principal to pay and paying those bills with a third party's money—would have exercised reasonable care to ensure the bills were correct. In this context, a reasonable TPA in Defendant's position would have exercised reasonable care to ensure the bills were properly coded and were not

70

excessive. Defendant failed to do this, however, and caused Plaintiff to pay excessive amounts on bills—measured on an individual basis and in the aggregate—from providers and PBMs.

155.    Defendant also had access to Plaintiff's money and unlimited authority to use it to pay Defendant's network providers and PBMs. With this authority as Plaintiff's agent, Defendant owed a duty of reasonable care to ensure it was not overpaying by paying miscoded bills and bills for excessive charges. Defendant also owed a duty to ensure that payments were decreased or offset by discounts and rebates to which Defendant and its non-fiduciary network providers and PBMs agreed would apply to Defendant's payment of claims on Plaintiff's behalf. But Defendant negligently and recklessly increased costs to Plaintiff by overpaying bills that were obviously excessive and miscoded and by failing to collect rebates and recognize discounts. *Supra* ¶¶ 68-79, 83-86, 89-98. A reasonably prudent TPA in Defendant's position would have systems and protocols in place to prevent or recover such payments. Defendant failed to do so.

156.    As a result of Defendant's negligent acts, Plaintiff overpaid for medical and prescription claims.

157.    As a result of these actions, Plaintiff suffered at least tens of millions of dollars in damages. Moreover, Defendant has received and retained revenue exceeding its fair, disclosed payment for TPA services.

### TOLLING OF LIMITATIONS PERIODS

158.    As noted above, a contract provides that the statute of limitations for Plaintiff's claims have been tolled. The effect of that tolling agreement is that, for purposes

71

of claims that existed as of February 13, 2023, Plaintiff's Original Complaint is treated as if it were filed February 13, 2023, for limitations purposes.

159.    Further, with the exercise of reasonable diligence, Plaintiff could not have discovered the misconduct alleged and resulting losses supporting Plaintiff's claims for damages and losses until July 2024. Plaintiff's inability to discover the facts and losses supporting Plaintiff's claims for damages was caused by Defendant's fraud, concealment, and obstruction. Specifically, Defendant intentionally reported false information to Plaintiff, which generally indicated that Defendant complied with its relevant duties and managed the Plan and its assets as a loyal and prudent fiduciary. Defendant's reports to Plaintiff were designed to offer assurances to Plaintiff and to prevent Plaintiff from investigating potential misconduct and damages at issue in this case. For instance, Defendant did not report that it used Plan funds to pay duplicate claims. Defendant did not report that it used Plan funds to pay more than billed amounts for certain claims. Defendant did not report that it or its affiliates pocketed prescription rebates that the Plan should have received. Instead, Defendant repeatedly reported and represented to Plaintiff that it served as a loyal, prudent fiduciary for the plan and limited Plan costs accordingly.

160.    While owing a duty to disclose its misconduct alleged in this Complaint under the ASA and by virtue of its fiduciary role, Defendant refused to disclose its misconduct or the losses sustained by that misconduct. Moreover, Defendant actively concealed its misconduct and Plan losses by concealing and refusing to share the Plan's claims data to Plaintiff. The misconduct and losses at issue in this lawsuit were undetectable and unknowable to Plaintiff without the Plan's claims data. As noted above,

72

Plaintiff began requesting the Plan's claims data from Defendant in 2021. Given the timing of Plaintiff's receipt of some of the claims data and the time and expertise necessary to analyze that data, Plaintiff could not have realized the misconduct and damages at issue until July 2024.

161.   By way of example, until Plaintiff received the claims data in late December 2023 and had an opportunity to analyze that data, Plaintiff had no way of knowing Defendant charged Plaintiff more on certain claims than was billed by the relevant provider. Plaintiff had no way of knowing that Defendant withheld prescription rebates belonging to Plaintiff. Plaintiff's inability to uncover this and other alleged misconduct and the damages it caused existed until Plaintiff received a portion of the claims data and had a reasonable opportunity to analyze it, which did not occur before July 2024.

## JURY DEMAND

162.   Plaintiff Owens & Minor, individually and on behalf of the Plan, hereby demands a trial by jury for all issues triable by jury.

## PRAYER FOR RELIEF

163.   Plaintiff seeks an order requiring Defendant to pay damages caused by the misconduct described above in an amount to be proved at trial.

164.   Plaintiff seeks an order requiring Defendant to return monies Defendant received or paid by the Plan by virtue of misconduct alleged above and all other applicable equitable relief provided by ERISA.

165.   Plaintiff seeks reasonable attorney's fees and costs.

*[Signature Block on Next Page]*

73

Dated: September 9, 2025                          Respectfully submitted,

OWENS & MINOR, INC. and
OWENS & MINOR FLEXIBLE
BENEFITS PLAN
By:

_____/s/_____
COMMONWEALTH LAW GROUP
Seth Carroll (VSB No. 74745)
Matthew Lastrapes (VSB No. 84097)
3311 West Broad Street
Richmond, VA 23230
Phone: (804) 551-9650
Facsimile: (866) 238-6415
scarroll@hurtinva.com
mlastrapes@hurtinva.com

THE LANIER LAW FIRM, P.C.
W. Mark Lanier
Texas State Bar No. 11934600
*pro hac vice*
Benjamin Major
Texas State Bar No. 24074639
*pro hac vice*
Ryan D. Ellis
Texas State Bar No. 24087470
*pro hac vice*
Julian Cokic
Texas State Bar No. 24118977
*pro hac vice*
10940 W. Sam Houston Pkwy N.
Suite 100
Houston, Texas 77064
Telephone: (713) 659-5200
Facsimile: (713) 659-2204
WML@lanierlawfirm.com
Ben.Major@lanierlawfirm.com
Ryan.Ellis@lanierlawfirm.com
Julian.Cokic@lanierlawfirm.com

74

PLEVIN AND GALLUCCI CO., LPA

Frank Gallucci
Ohio State Bar No. 72680
*pro hac vice*
55 Public Square
Suite 2222
Cleveland, Ohio 44113
Telephone: (216) 861-0804
Facsimile: (216) 861-5322
FGallucci@pglawyer.com

**ATTORNEYS FOR PLAINTIFFS**